properly overruled. It follows that the judgment, conviction, and orders appealed from should be affirmed.

Judgment, conviction, and orders affirmed, and case remitted to the county court of Monroe county, pursuant to section 547 of the Code of Criminal Procedure. All concur.

(72 App. Div. 294.)

STILLWATER & M. ST. RY. CO. v. BOSTON & M. R. R.

(Supreme Court, Appellate Division, Third Department. May 7, 1902.)

1. STREET RAILROADS—CONNECTIONS WITH STEAM RAILROADS—STATUTES—CONSTRUCTION.

Laws 1884, c. 252, providing for the construction, maintenance, and operation of street surface railways, declares that they shall have all the privileges granted, and be subject to all the liabilities imposed, by Act 1850, authorizing the formation of railroad corporations. Act 1850, c. 140, re-enacted in Railroad Law 1890, § 4, subd. 5, conferred on every steam railroad the right to cross, join, or unite its railroad with any other railroad before constructed, at any point on its route, and on the grounds of such other railroad company, with the necessary conveniences in furtherance of the object of its connection. Railroad Law 1890, § 12, provides that every railroad corporation whose road is or shall be intersected by any new railroad shall unite with the corporation owning such new railroad in forming necessary intersections and connections, and grant the requisite facilities therefor. Held, that such provisions do not confer on street railway companies the right to join and unite with steam railroads so as to facilitate a free interchange of cars between them.

2. SAME—RIGHT TO CONNECT—NECESSITY.

Under Railroad Law 1890, § 12, providing that every railroad corporation whose road is or shall be intersected by any new railroad shall unite with the corporation owning such road in forming the necessary connections, where a street railway company seeking to compel a steam railroad company to interchange cars with it is operated for its entire length parallel with the steam railroad, and does not transport any freight destined to any point on such railroad line, there is no necessity entitling it to such connection and interchange of cars, even if it be conceded the right to make application to the court therefor.

Chase, J., dissenting.

Appeal from special term.

Proceeding by the Stillwater & Mechanicsville Street Railway Company against the Boston & Maine Railroad for the appointment of commissioners under Railroad Law, § 12. From a special term order confirming the report of commissioners, and directing that the Boston & Maine Railroad connect with the Stillwater & Mechanicsville Street Railway, and that such railroad permit the street railway to make such connections, and to erect thereon, over tracks so constructed by it, the necessary poles, and string and maintain the necessary wires on and over such tracks, and over the Boston & Maine Railroad, at the point of intersection, to facilitate the free interchange of cars, the defendant appeals. Reversed.

See 73 N. Y. Supp. 744.

Argued before PARKER, P. J., and KELLOGG, SMITH, CHASE, and FURSMAN, JJ.

T. F. Hamilton (Lewis E. Carr, of counsel), for appellant.

Thomas O'Connor, for appellee.

KELLOGG, J. This is a compulsory proceeding instituted by a street railway corporation, and its purpose is clearly stated in the special term order,—"to facilitate the free interchange of cars" with a railroad belonging to the steam railroad system. The proceeding is new, the purpose new, and obviously the order of the special term opens up a field of inquiry of the greatest importance, not alone to railroad corporations, but to the general public, which has an interest in the streets and highways of the towns, villages, and cities of the state. It means that the street surface railways, commonly known as the "pony roads," are to be recognized as an integral part of the great system of steam railroads of the country; that they have the right to force the steam railroads to an interchange of both passengers and freight cars to the same extent that such interchange prevails between railroads operated by steam power alone. If the purpose of this street railway gains the approbation and aid of the courts, it must be upon the determination of the court that the legislature has already considered the subject, and given to this scheme its sanction in terms so plain as not to admit of a serious doubt. If there is room for doubt as to the legislative intent, the subject is of such gravity that it should be relegated to the lawmaking body for clearer instruction,—for all needful legislation to safeguard the rights of the public and the individuals to be affected by this new alliance.

An examination of the various laws heretofore passed will lead to the conclusion that heretofore the legislature has recognized three systems of railways,—the steam railway, known as the "commercial roads," the street railway, and the elevated railway. The first system is the steam railway system, having and owning its own right of way. These embrace all the commercial railroads, and since 1828 the system has grown into vast proportions over the whole continent, and is made practicable, and to the public useful, by interchange of cars, so that trains are not broken, nor a car load of freight disturbed, in traversing from one side of the continent to the other. This great expansion of the system has always been in one direction, along its original lines; and those lines have never interfered, except incidentally, with the free public use of streets and highways. This system has its tracks constructed on its own lands. It could not do its business if it occupied the streets and highways in common with the public. Prior to 1848 there existed no general law under which railroad corporations could organize. Each had its special charter. In 1850 a new general act was passed (chapter 140). Neither in this law, nor in any prior law, do we find any recognition of the so-called street railway, nor in fact was such a system then known. The law of 1850 and all prior laws were adapted to the known steam railroad system, using its own private way. A short time prior to 1875 the street surface railroad came into notice. By various special acts of the legislature, and by organizing under the steam railroad law of 1850, a system of horse cars on the public highways and streets was put into operation. The constitutional convention of 1875, by section 18 of article 3 of the constitution then passed, took notice of the street railroad, and placed limitations upon the legislature in respect to it. Nothing there is said concerning the then well-known system of steam railroads. It

was recognized as a system for streets in villages and cities, and for highways between villages. Single cars drawn by horses, principally for carrying passengers short distances for a small fare, stopping at every street crossing, was the distinctive character of the street railway, and was more a substitute for the omnibus than anything else. Without doubt, this system was of great convenience, and rendered a valuable public service, with the least possible interruption of the use by the general public of the streets and highways, and with little, if any, depreciation of values to abutting properties. In all states outside of New York this use of the streets and highways has been declared to add nothing to the street servitude, and abutting owners have in all cases been adjudged not to be entitled to additional compensation because of this use. That the courts have otherwise decided in this state (Craig v. Railroad Co., 39 N. Y. 404; Peck v. Railway Co. [court of appeals decision, April 1, 1902] 63 N. E. 357) in no way affects the status of the system as the public view it, and as the legislature is presumed to have viewed it. This street railway system has continued for nearly 30 years on the lines upon which it was started. It has expanded in the direction of covering more territory, and by connection and consolidation with other street railways, and has, for the most part, with the consent of the legislature, local authorities, and property owners, exchanged its horses for cable or electrical power; but it still operates the single, light passenger cars, and does almost exclusively a passenger business, as when it began, and it has not omitted to seize upon all the business and residential streets and highways in towns, villages, and cities.

The legislature for the first time enacted a general law applicable to street railways only in 1884 (chapter 252). The act is entitled:

"An act to provide for the construction, extension, maintenance and operation of street surface railroads and branches thereof in cities, towns and villages."

And the provisions of the act properly suggest the title. In this act of 1884 we find a provision as follows (section 1):

"Such corporation shall also have all the powers and privileges granted and be subject to all the liabilities imposed by this act, or by the act entitled 'An act to authorize the formation of railroad corporations and to regulate the same,' passed April second, eighteen hundred and fifty, and the several acts amendatory thereof, except as the said acts are herein modified."

In this act of 1884 we find a provision (section 15) permitting one street railroad to lease, or by consent to run cars upon, the tracks of other street railroads; but nothing in this act is otherwise said as to crossing, intersecting, or connecting with other street railways, or with any steam railroad. In the act of 1850 (chapter 140) here referred to, we find among the rights conferred upon steam railroads this provision (subdivision 6, § 28):

The right "to cross, intersect, join and unite its railroad with any other railroad before constructed, at any point on its route, and upon the grounds of such other railroad company, with the necessary turn-outs, sidings and switches and other conveniences in furtherance of the objects of its connections. And every company whose railroad is or shall be hereafter intersected by any new railroad shall unite with the owners of such new railroad

in forming such intersections and connections and grant the facilities afore-said."

This provision, without doubt, authorizes any railroad company to cross the tracks of any other railroad company. It is obviously a necessity to cross. The statutes of the state recognize the right of any railroad to cross a public highway, and the right, also, to construct a highway across any railroad; but the right to "join and unite its railroad with any other railroad" must always be "in furtherance of the object of its connections." That object must be a legitimate one, —one suggested by the public uses the railway company was organized to serve. The object to be reached in connecting a steam railroad with another steam railroad is apparent. The business which these roads were organized to do could not be done profitably, or to the satisfaction of the public, otherwise. That connection between street rail-roads also presents a legitimate object, practicable and commendable as a measure of profit and of public convenience is also apparent, and is entirely within and in furtherance of the uses for which street railways were created. The same may be said of the union of different lines of elevated railways. But to "join and unite" a street railway system with the commercial railway system suggests nothing but a misce-genation,—a subversion of the very uses which the street railway was born to serve. It cannot, therefore, be well argued that the law of 1884, by its reference to the law of 1850, intended to confer upon street railroads the right to "join and unite" with the commercial rail-roads, and so become an integral part of the steam railroad system. In 1890 the codification of railroad laws resulted in the passage in that year of the so-called general railroad law (chapter 565), and that law, with its various amendments since its passage, constitutes nearly all the general statutory law on the subject of railroads; all others having been repealed, except certain fragments of old laws, immaterial to the question before us. The first 3 articles of the railroad law of 1890, embracing the first 84 sections, appear to have been formed, mostly, to apply to the steam railroads. Some of these sections, and some parts of sections in these three articles, properly apply to street sur-face railways and to elevated railways, and it is apparent that it was the intention of the legislature that they should so apply. The only test as to which sections or parts of sections do apply to the street railways is their fitness, considering the power used, the business to be done, the method employed, the locality of operation, and the uses sought to be served by that railway system. As an illustration of this, section 53 provides:

"No person other than those connected with or employed upon the rail-road shall walk upon or along its track or tracks except where the same shall be laid across or along streets or highways, in which case he shall not walk upon the track unless necessary to cross the same. Any person rid-ing, leading or driving any horse or other animal upon any railroad * * * without the consent of the corporation shall forfeit to the people of the state the sum of ten dollars."

This cannot apply, from the nature of things, to street railways, al-though the act does not say so. Article 4 is applicable exclusively to street surface railroads, and article 5 applies to what are known as

"elevated railroads." The legislature has continued to recognize the three systems as separate and independent of each other, and has provided separate regulations for each, fitted to the business to be done. Section 49, by its terms, applies only to railroads whose operating power is steam. It provides for a certain style of switches, for certain couplers to be used on freight cars, and automatic air brakes for passenger cars. Nowhere does the legislature require such things of the street railroads. It makes many other provisions in this and other sections touching the safety and convenience of cars operated by steam, and is silent on such subjects in regulating street railways. If the legislature had contemplated an interchange of cars, such as the order in this case makes obligatory, it could not have reasonably exempted street railroads from these requirements. The provision as to grade crossings, and the prohibitions thereof, apply to steam railroads, and not to street railways; but, if the legislature had contemplated that the street railway might become a part of the steam railroad system,—the only difference being, instead of steam, a use of electrical engines, as powerful, however, as steam engines, and capable of hauling as long a train with the same rapidity,—it would seem as though there would be the same danger from grade crossings. Section 80 restricts all railroads, except street surface railroads, from owning or operating roads run on parallel or competing lines, without the consent of the board of railroad commissioners. This discrimination in favor of street railways would have been unreasonable, had the legislature considered that the street surface railway had the same capacity and right to do the business done by the steam railroads, and had the right to, in effect, become a part of the commercial railroad system. These are only a few of the many provisions of the railroad law which bear directly upon the question as to whether the legislature had ever, in fact, considered this subject in the light of the claim here made by this street railway of a right to force an interchange of passenger and freight cars with a steam railroad having railroad connections with all places of importance on the continent. In the railroad law of 1890 we find a similar provision as to crossings, intersections, and connections as was contained in the law of 1850, above quoted. The change in the phraseology is probably not material. Subdivision 5 of section 4 gives the right to the railroad corporations—

"To cross, intersect, join or unite its railroad with any other railroad before constructed, at any point on its route and upon the ground of such other railroad corporation, with the necessary turnouts, sidings, switches and other conveniences in furtherance of the objects of its connections."

It is under this provision that this street railway gets power to enforce a traffic connection, if anywhere. What we have heretofore said as to this provision appearing in the law of 1850 is as applicable to this provision as to that, for the phraseology is the same in all material respects. Section 12, to which the petition in this case refers, reads as follows:

"Every railroad corporation whose road is or shall be intersected by any new railroad shall unite with the corporation owning such new railroad in forming the necessary intersections and connections and grant the requisite facilities therefor."

Subdivision 5 of section 4, it would seem, was intended to cover the case of roads before constructed; and section 12, to cover new railroads, or railroads constructed subsequent to the one making the application. However that may be, the right mentioned in section 12 is only available in forming "necessary intersections and connections." There is no connection necessary unless, as we have said, the legislature, in unequivocal language, has recognized the right of street railways to become an integral part of the steam commercial system of the country. It was said in People v. Newton, 112 N. Y. 399, 19 N. E. 832, 3 L. R. A. 174:

"The terms of the grant conferring the right which is asserted are to be strictly construed, and the privileges it confers cannot be extended by inference. If there is any ambiguity, it must operate against the company; the general rule being that the grant shall be construed most strongly against the party claiming under it, and every reasonable doubt resolved adversely to it. Nothing is to be taken as conceded but what is given in unmistakable terms; and as was said in Langdon v. Mayor, etc., 93 N. Y. 145, 'whatever is not unequivocally granted is deemed to be withheld.' Nothing passes by implication."

The terms of the grant to this street railway were the right of "constructing, maintaining and operating a street railway for public use in the conveyance of persons and property" between Stillwater and Mechanicsville,—a distance of four miles. All street railways organized under general laws have the right to "convey persons and property," and, if it was ever a seriously disputed question as to whether these corporations could carry property or freight in separate cars over their roads, such doubts were settled in De Grauw v. Railway Co., 43 App. Div. 502, 60 N. Y. Supp. 163, affirmed in 163 N. Y. 597, 57 N. E. 1108. The proposition there presented, however, and settled, is not the proposition here; nor does the question here in any manner depend upon the right of a street railway to carry property offered in the local districts for carriage to other points in such local districts. This limited right does not necessitate an interchange of cars, either passenger or freight, with the commercial roads. It does not subject the highways and streets to the same uses to which commercial railroads subject their private rights of way. If it shall be determined that street railways may force a connection with steam railroads for the purpose of compelling an interchange of cars, the steam railroads may also force the street railroads to haul their cars, both passenger and freight; and, under the rule governing common carriers, the fact that these street railways were not equipped would be no excuse for refusal. It was held in Condict v. Railway Co., 54 N. Y. 500, that it is the duty of a common carrier to have adequate facilities for transportation. The acceptance of the grant to carry persons and property is a promise to carry all that is offered. I do not think that it is any answer to the objections suggested to say that the legislature has the power to regulate the use of the highways and streets, and protect the public in its right to use them as against this proposed enlarged use by the street railroads. The very suggestion that regulation would be needful is a confession that the legislature has never yet contemplated such use, and until it has provided for it, regulated it, safeguarded it, the street railroads cannot claim that such use is covered by

their grants.   We have no right to anticipate the legislature, and no right to assume that it will do what it may do.   The question is, what has it done?   We are asked here to say that this street railway may force an interchange of cars with a great trunk line, operating a steam railroad, at one of its terminals; and not only that, but that it may also force a connection with another trunk line at its other terminal, and thus become a link in a through line for freight and passengers from Puget Sound to Boston.   If it has a right to a connection with the Boston & Maine Railroad, it follows that it has the right to connect with the Canadian Pacific, if it should extend its present line to intersect with that road.   It is a question here of right, not one of probabilities.   It is needless to point out the disastrous consequences to the highways of the towns, and the streets of villages and cities, if such connections should be declared lawful.   The servitude of these highways and streets to accommodate an unlimited traffic of this nature would be enormously increased, and their value to the public proportionately diminished.   There is no point at which the line of restriction can be drawn, if once it is declared that such a union between the two systems can be compelled at the instance of either. And it is certain that the street railroad corporations will not be backward in asserting their rights whenever a profit is in sight.

On the theory that the order herein made would be proper in any case arising between a street railroad and a steam railroad,—a proposition to which I cannot agree,—the question arises, was the order a proper one under the facts disclosed?   The applicant for the order, it appears, was organized in 1882 to operate a four-mile street railroad between and through the villages of Stillwater and Mechanicsville. It laid its single track along the business streets of those villages, and in the highway between the villages.   Subsequently it extended its line eight miles southerly through the village of Waterford, and there connected with the United Traction Company, whose lines run through the cities of Cohoes, Watervliet, Albany, and Troy, and connect with the Albany & Hudson Street Railway, having its terminus in the city of Hudson.   Subsequently, and in 1900, this corporation came into the management of the Greenwich & Schuylerville Street Railroad, extending northerly from Stillwater, with a single track to Greenwich, Schuylerville, and Ft. Edward, where it connects with a street railroad running further north, through Sandy Hill and Glens Falls. All these villages are reached, also, by steam railroads.   This applicant is connected with a system of street railroads extending north and south something over 100 miles, paralleling steam railroads for the entire, or nearly entire, distance.   It does not appear that it has ever run any freight cars on any part of its line, or its connecting lines, carrying freight to be delivered to the Boston & Maine Railroad.   Its annual report for 1900 shows nothing whatever earned for carrying freight or property, but a considerable sum was earned for carrying persons.   It does not appear that there are or will be any car loads of freight carried over its line, destined to any point on the Boston & Maine Railroad.   The company has a single electrical engine, and that is operated by the overhead trolley system.   The engine is 140 horse power,—a sufficient capacity to handle freight trains.   The com-

pany, from its petition and proofs, seems to rely on its own wishes in, the premises, and not upon any facts showing a need for this connection. The Boston & Maine Railroad objects to the connection; objects to having the trolley line strung along and over its tracks, and, to the working of this trolley system in connection with its steam locomotive system; objects to being compelled to handle the freight cars of a railway company which is exempted from the regulation as to car couplers which is imposed upon a steam railroad; and objects to being compelled to interchange cars with a company not in its own class. I do not think the interchange of cars here sought was ever by the legislature contemplated; and, in any event, the facts disclosed on this application do not show such a necessity for interchange as the law contemplates shall exist before a connection can be compelled.

The order, therefore, should be reversed, with costs, and the application dismissed, with costs. All concur, except CHASE, J., who dissents.

SMITH, J. (concurring). If this connection and the interchange of freight cars be compulsory, any trolley company can haul long freight trains ad libitum through the crowded streets of any city of the state. This was not, in my judgment, one of the burdens contemplated in the granting of consents to the construction of the road, either by adjoining property owners or the municipalities. It should only be permitted under strict regulations. I therefore agree with Justice KELLOGG that, in the absence of such regulations, it cannot be presumed that the legislature intended to authorize a connection which would involve such far-reaching results. Such right should rest upon a clear grant. It is better to deny the power under the present statute, and leave to the legislature to make clear its intention to give the right when such conditions may be attached as will protect the public interests.