the charter above cited must be regarded as operative, according to the language used, and irrespective of the question of the incompatibility of the office and position concurrently held.

The position of sergeant at arms is provided for in section 27 of the charter (Laws 1897, p. 11, c. 378) whereby the council and board of aldermen were each authorized "to elect a sergeant at arms, and such assistants as are needful to the orderly conduct of their meetings." The question remains, is the sergeant at arms thereby made an officer of the city or an employé? Considering the nature of his duties as ordinarily understood and as expressed in the section last cited, he would appear to be a servant or employé. No proof has been made or statute cited that he is charged with any independent duties, or that any trust is imposed upon him by the sanction and restraints of legal authority in official life. "The distinction is plainly taken between a person acting as a servant or employé who does not discharge independent duties but acts by the direction of others, and an officer empowered to act in the discharge of a duty or trust under obligation imposed by the sanction and restraints of legal authority in official life." Olmstead v. Mayor, 42 N. Y. Super. Ct. 481. See, also, People ex rel. Gilchrist v. Murray, 73 N. Y. 535. There should be judgment for the plaintiff as demanded in the complaint.

Judgment for plaintiff.

---

(45 Misc. Rep. 520.)

HUDSON VALLEY RY. CO. v. BOSTON & M. R. R.

(Supreme Court, Special Term, Warren County. December, 1904.)

1. RAILROADS—INTERSECTING LINES—EXCHANGE OF FREIGHT.
　　Under Railroad Law, § 12 (Laws 1890, p. 1087, c. 565), requiring intersecting railroads to receive from each other and forward to their destination "goods, merchandise, and other property," such railroads must receive cars and freight from each other, and transport the same.

2. SAME—INTERCHANGE OF LOADED CARS.
　　Railroad Law, § 12 (Laws 1890, p. 1087, c. 565), requiring intersecting railroads to receive from each other and forward merchandise and other property, and section 35 (page 1094), requiring such lines to afford each other equal terms for accommodation in the transportation of cars, passengers, baggage, and freight, required such roads to interchange cars loaded with freight.

3. SAME—CONDEMNING LAND.
　　The power to condemn land for the purpose of making connections with intersecting roads must be exercised by a railroad corporation.

4. SAME—COMPELLING INTERCHANGE.
　　On refusal of an intersecting road to receive the cars of the other road, complainant is not remitted to the Railroad Commissioners for redress, but the courts can determine the right of interchange, and, on failure of the roads to agree on the terms, these may be fixed by the Commissioners.

Action by the Hudson Valley Railway Company against the Boston & Maine Railroad. Decree for plaintiff.

W. L. Kiley and Charles A. Gardiner, for plaintiff.
Lewis E. Carr, for defendant.

JOHN M. KELLOGG, J.   The plaintiff seeks an injunction requiring the defendant to receive cars and car-load lots of freight, and to deliver cars and car-load lots of freight to the plaintiff, at Stillwater and Saratoga, at which points there are physical connections of their respective roads.   The connection at Stillwater was forced upon the defendant under section 12 of the railroad law (Laws 1890, p. 1087, c. 565), by virtue of the decision in Matter of Stillwater & Mechanicsville Street R. Co. v. Boston & Maine R. Co., 171 N. Y. 589, 64 N. E. 511, 59 L. R. A. 489, the Stillwater Company in that case being one of the subsidiary companies of the plaintiff; and following that decision the connection was made by an agreement.   That decision gives to a street railway company the same right of connection under section 12 as to a steam railroad company, and in that case the Special Term directed the connection to be made "in order to facilitate the free interchange of cars between the two roads."   The Appellate Division (72 App. Div. 294, 76 N. Y. Supp. 69.) reversed the order of the Special Term; holding, in substance, that a free interchange of cars was impracticable and undesirable, and was not intended by section 12.   The Court of Appeals affirmed the order of the Special Term, and seems to approach the discussion upon substantially the same grounds as considered by the Appellate Division; viewing the question not merely as to the right to force a physical connection, but as to the right to force a physical connection carrying with it the right to interchange cars; assuming, if an interchange of cars is impracticable or not to be had, that a physical connection cannot be required.   The plaintiff contends that that decision establishes the position that the connection, under section 12 of the railroad law, is not only intended for a free interchange of cars, but that the establishment of the connection establishes the right to such interchange.   The defendant considers that part of the discussion as not before the court and not embraced in its decision; and the defendant relies with confidence upon People ex rel. Jennings v. Delaware & Hudson Canal Company, recently decided by our Appellate Division, as disposing of the question in suit.   In that case the Special Term, without opinion, refused to compel the defendant by a mandamus to accept cars from the plaintiff road.   The defendant, in the Appellate Division, contended that the decision of the court below was simply a denial of the remedy by mandamus.   Upon the facts it appeared that the relator in that case was indebted to the defendant for similar services, was in the hands of a receiver, and that its road was not suitable for freight traffic.   There being no opinion either at Special Term or in the Appellate Division, it is difficult to decide just what was determined in that case.   But it being conceded by counsel on both sides that there are no other decisions in this state upon the question whether one road can be compelled to receive or deliver cars to a connecting road, it is fair to assume that the Appellate Division would not have decided that question without a statement of the reasons for such decision.   The proceeding by mandamus is not an ordinary legal remedy, and a court applied to for such a writ in a case where there is an adequate remedy by

action may grant or refuse the writ, in its sound discretion, and ordinarily such decision will not be interfered with on appeal. People ex rel. Treat v. Coler, 166 N. Y. 144, 59 N. E. 776.; People ex rel. Murray v. Lindenthal, 77 App. Div. 515, 78 N. Y. Supp. 997. And where one carrier refuses to receive the cars of another carrier, tendered in the ordinary course of business, a situation is presented, considering the interests of the public, the delays in carrying on the business of the carrier, and the inability of a court to determine what the legal damages are in the case of each refusal, and the avoidance of a multiplicity of suits arising from each refusal, which a court of equity is competent to deal with, and which falls within the peculiar province of such a court. We think, under all the circumstances, it is therefore fair to assume that the Special Term denied the writ in the Oneonta case as a matter of discretion, refusing the extraordinary remedy, and leaving the plaintiff to an equitable action to enforce its rights, and that the Appellate Division, viewing such decision as a matter of sound discretion, affirmed the order without opinion.

The defendant also relies with confidence upon A., T. & S. F. R. v. D. & N. O. R. R., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291, and C. S. Y. Co. v. E. & N. R. Co., 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 476. Neither of those cases decided the question here presented. In the former it was decided that the Colorado Constitution did not require an old road, where a new road made a physical connection with it outside its station, to stop all its trains there, maintain an agent there, sell tickets, check baggage, bill freight, and maintain the relations practically establishing a through route, and that no such duty existed at common law. The court remarked at page 681 of 110 U. S., page 192 of 4 Sup. Ct. (28 L. Ed. 291):

"It [defendant] saw fit to establish its junction at a place away from the station which the A., T. & S. F. Co. had, in the exercise of its legal discretion, located for its own convenience and that of the public. It does not now ask to enter that station with its tracks, or to interchange business at that place, but to compel the A., T. & S. F. Co. to stop at its station and transact a connecting business there."

And at page 684 of 110 U. S., page 193 of 4 Sup. Ct. (28 L. Ed. 291):

"When a business connection shall be established between the D. & N. O. Co. and the A., T. & S. F. at their junction, and a continuous line formed, different questions may arise."

In the case at bar this different question does arise, for no complaint is made here that the physical connection is not at a regular stopping place of the defendant, and the only question is as to the delivery and receipt of freight and cars. No through connecting business forming a continuous line is sought or claimed. And in this case the question to be determined is, what are the rights under the New York state statutes? and that decision as to the Colorado statutes furnishes us but little aid.

In Central Stockyard Co. v. L. N. R. Co., supra, the Constitution of the state of Kentucky was interpreted, and at page 572 of 192 U. S., page 341 of 24 Sup. Ct. (48 L. Ed. 476), the court says it de-

termines the question as if the stockyards of the plaintiff and the defendant were side by side, and it did not involve the rights of the parties as to freight or freight cars which were in transit, but simply as to which station it must deliver its freight.

It seems, therefore, that the rights of the parties here depend entirely on the statutes of this state, and they have not been construed, so far as the question here involved is concerned, unless the decision of the Stillwater Case, in 171 N. Y. 589, 64 N. E. 511, 59 L. R. A. 489, is considered an interpretation of the statute. The defendant plants itself upon the ground that its cars are its property, and it has the right to control them in its own way, and that it cannot be compelled to carry the cars of other companies upon its road, except by contract. It overlooks the broad proposition that a railroad is of a semipublic nature, and assumes somewhat the form of a public utility; that, while the stockholder views it as operated for his benefit, the public views it as being maintained also for the convenience of the people, the transaction of the people's business, and a means of commerce. It is a common carrier of freight and property—a highway, as it were, for the transaction of the business of the public according to such reasonable rules and regulations as the company may establish, and which are not against public policy. The owner, by putting his private property into the track, and the cars upon it, has lost some of the absolute and independent control which he had over his property by dedicating it to this public use, and his profit and interest, and the demands of public commerce and public business, are the rules which must govern the use and operation of the property. The defendant contends that it has not refused to receive or deliver freight, but that it only refused to receive or deliver the vehicle in which freight is contained. But whether the refusal of the vehicle is a refusal of the freight depends to a great extent upon the nature of the freight, the packages in which it is contained, and the manner in which that class of freight is usually transported. A carrier cannot require the shipper to deliver freight in just the form which the carrier, through caprice, may require, but must receive the freight in the way and manner in which it is usually shipped and generally forwarded. We can see that the refusal to receive or deliver an oil tank car containing oil is practically a refusal of the oil. The same is true of coal and grain and other merchandise which may be shipped in bulk in a freight car, and contained in no separate package; the car being, as it were, the package in which the coal or grain is shipped. And if this bulk is broken, and it is required to be taken in boxes or bins, the expense of removal to another car and the delay of the reshipment would be so great that it would practically destroy the right to ship. If car loads of freight are usually shipped to their destination without breaking bulk, competition in all lines of business is so keen that the shipper who must submit to the delay and expense of the transfer from car to car at every railroad connection cannot compete with his competitor, who has to suffer no such expense or delay, and, in substance, transportation of his freight is denied to him. When, therefore, a company refuses to receive freight in a

car which is usually shipped by the car load, and the expense or delay in the handling of the freight from one car to another might be such as practically to destroy the profit in shipping, it, in effect and substance, refuses the freight.

A railroad company, under subdivision 7 of section 4 of the railroad law (page 1084), has power to take and convey persons and property on its railroad, and receive compensation therefor. Under this section it does all its business and gets all its earnings. The railroad law, when it speaks of a railroad carrying property, uses the word "property" in its broadest sense, and seems to embrace everything which a railroad may carry, except persons. Under this word "property" it transfers, for hire or otherwise, the cars of other railroads, either with or without freight, and may take a new and empty car from the factory upon its road and deliver it to the road for which it is intended; and its right to receive pay arises from the fact that it is carrying property, within the meaning of this statute. Section 12 of the railroad law requires that railroads which are intersected by another railroad "shall receive from each other and forward to their destination, goods, merchandise and other property intended for points on their respective roads, with the same dispatch as, and at a rate of freight not exceeding the local tariff rate charged for similar goods, merchandise and other property, received at or forwarded from the same point for individuals and other corporations." It will be noted that this section does not use the word "cars," but requires the forwarding of all merchandise "and other property." "Other property" properly means any property which, from its nature and the condition in which it is, is reasonably capable of being transported over the road. In my judgment, a car load of merchandise comes within the provisions of this section, either as merchandise, the car being treated as the package or holder of the merchandise, and if it is such a package or holder as is usual in the transportation and carriage of such merchandise, it seems unreasonable and proper for the company to refuse to accept it; or the car, if we separate it from the merchandise, well comes within the term "other property" mentioned in the statute, because it is such property as is usually transported on a railroad. And if there were doubt about this position, it is somewhat cleared by section 35 of the railroad law (page 1094) which requires a railroad whose road at or near the same place connects with or is intersected by two or more roads competing for its business to fairly and impartially afford to each of such connecting or intersecting roads equal terms of accommodation, privileges, and facilities in the transportation of cars, passengers, baggage, and freight over and upon its roads, etc. This section leaves out the words "other property," and in place of them uses the words "cars, baggage and freight." By reading the two sections together, it may fairly be inferred that the Legislature intended by the general railroad law that railroads should interchange cars loaded with freight, and that the intersection provided for by section 12 of that law was intended for that purpose. And this fact is emphasized by subdivision 5 of section 4 of the same act, which empowers the roads to intersect and to

build and maintain switches and other conveniences in furtherance of the objects of its connections. The object of its connections is to transfer cars from one road to the other. There can be no other good reason for a connection, and the railroads having the power to make the connection, and, if necessary, to condemn private property for that purpose, it becomes the duty of each to exercise the power granted it, and use the connection for the purpose for which it was created. It is apparent, if one railroad is compelled to transfer freight from one car to another, and perhaps furnish new receptacles in which to place the freight when it is in the car in bulk, that it is not being transported with equal facility or on equal terms with another railroad which transports its freight in the car in which it was originally placed. The connection at Stillwater, it is urged by the plaintiff, fairly comes within section 35, above referred to. And while it is true, as stated by the defendant, that the moving papers do not show that the Delaware & Hudson and the plaintiff are competing for the business of this defendant at or near that place, the facts are fairly well supplied by the answering affidavits, which show that the connection of the Delaware & Hudson is about a mile distant from the connection of the defendant with the plaintiff at Stillwater, and that the Delaware & Hudson Company covers nearly all the territory and points reached by plaintiff. It thus appears that the Delaware & Hudson and the plaintiff are competing for the business of the defendant at or near Stillwater, and that therefore section 35 requires an interchange of cars with substantially the same facility and on equal terms as granted the Delaware & Hudson at or near that point.

The defendant's contention that, if it has violated section 35 of the railroad law, the plaintiff's only remedy is an application to the Railroad Commissioners for redress, is not well taken. That section authorizes the Railroad Commissioners to prescribe such rules as will secure equal enjoyment of equal accommodation and facilities at such intersections, and the terms and conditions upon which interchange of traffic shall be afforded each road. That section enables any dispute as to the terms and conditions upon which the interchange can be made to be settled by the Railroad Commission. It does not furnish the only remedy where an interchange is absolutely refused without regard to terms and conditions, and where one of the roads claims that the statute does not require such interchange. This court may construe the statute and determine the right to an interchange. If the parties cannot agree upon the terms and conditions of the interchange after the right is established by the court, the Railroad Commission is competent to fix the terms and conditions.

The defendant produces affidavits which it contends show that the plaintiff's road is not in fit condition for freight traffic. This is probably something of an afterthought, as a refusal to deliver cars was not put upon that ground, and it does not appear that, from the interchange of cars which previously existed between the plaintiff and defendant, it was discovered that the cars were injured upon the plaintiff's road in any manner; and it would seem from the fact

that there had been such interchange for some time, and to a considerable extent, and that no bad results followed, that that fact speaks louder than the opinion of experts criticising the physical condition of the road. We can well understand that the road is not adapted to freight business or the running of freight trains at the usual speed and manner, and can well understand that the running of freight cars through the villages would not be allowed with the same speed or manner in which it is done on steam railroads. But there is nothing in the case to show that the cars have been or will be seriously injured if properly handled upon the plaintiff's roads, and there is no proof in the case showing that the plaintiff is irresponsible or not able to pay for any damage which may arise from its carelessness or the improper construction of its way.

This is a motion to continue the injunction which was granted during the pendency of the motion, until the determination of the action. The question as to whether the defendant must load its cars with freight to be carried over the plaintiff's road can better be determined upon the trial of the action, and, in the discretion of the court, it is deemed best not to cover now that situation by an injunction; but there is no reason why, during the pendency of the action, the defendant should not receive from the plaintiff, for carriage, freight and freight in cars, or freight cars, where said cars are standard cars, and properly equipped, tendered to it at the connections referred to, upon its being paid its proper charges in relation thereto. Neither is there any reason why the defendant should not be required to deliver to the plaintiff at the several connections such car-load lots of freight, with the car, or such cars as it may receive from other roads consigned to parties upon the plaintiff's road, where the cars are consigned and billed by way of the plaintiff's road, and deliver such car-load lots of freight in car, and freight cars, as may be consigned to parties upon the plaintiff's road at points of destination not reached by the defendant's company or by any other connecting railroad.

Either party may apply to the court to fix the terms and conditions upon which the interchange of cars and freight shall be made, in case a dispute arises in any case in which the Railroad Commission is not competent to direct. If the order is not agreed upon, it will be settled upon 10 days' notice.

Ordered accordingly.