In the Matter of the Application of JOHN B. McDONALD, Appellant, for a Writ of Mandamus Directed to EDWARD M. GROUT, as Comptroller of the City of New York, Respondent.

*Underground rapid transit railroad in New York city — increased excavation necessary for the adoption of electricity as a motive power — vitrified ducts in the walls introduced for that purpose are "construction" as distinguished from "equipment" — the city owns and pays for the fee of the tunnel — the contractor owns and pays for the equipment — the latter is personal property — quære whether the contractor should pay additional rent for such added "construction."*

Chapter 4 of the Laws of 1891, as amended from time to time, authorizing the construction of an underground rapid transit railroad in the city of New York provides, in substance, that the city shall pay for the construction of the railroad and own the fee thereof and that the contractor employed to construct and operate the road shall equip the same at his own expense; that the city shall have a first lien upon such equipment as security for the faithful performance of the provisions of the contract, and that, at the expiration of the lease granted to the contractor, the city shall, if it elects not to renew the lease, pay for such equipment.

Section 35 of the act, as amended, provides: "The equipment to be supplied by the person, firm or corporation operating any such road shall include all rolling stock, motors, boilers, engines, wires, ways, conduits and mechanisms, machinery, tools, implements and devices of every nature whatsoever used for the generation or transmission of motive power and including all power-houses and all apparatus and all devices for signaling and ventilation."

Section 38 of the act, as amended, authorizes the board of rapid transit commissioners to agree with the contractor upon changes in or modifications of said contract or of the plans and specifications under which the road is to be constructed.

The contract, as finally executed, defines the word "equipment" to mean "all equipment used or intended for use on the railroad, including all motors, cars, whether used for passengers, freight, express or any other purpose, and all other rolling stock, all boilers, engines, wires, ways, conduits, mechanisms, machinery, power-houses, all real estate upon which any such power-houses shall stand or which shall be necessary for the generation or transmission of motive power, and all tools, implements and devices of every nature whatsoever used for such generation or transmission of motive power, and also all apparatus and devices for lighting, signaling and ventilation, whether such equipment be situate on or near or separate from the railway, provided that the same be used or intended for use in connection therewith, or for any of its purposes, and including all such equipment in existence at any time during or at the end of the term of the lease." It defines the word "construction" to mean "all the work of constructing the railroad, including the doing of work,

the providing of materials, the complete furnishing of the equipment of the railroad, the restoration and reconstruction of street surfaces, sewers and other sub-surface structures, and all other work or materials to be done or furnished of every nature whatsoever under the Agreement for Construction."

It further provides, " full and sufficient equipment, including all rolling stock, * * * subways, conduits and mechanisms, * * * implements and devices of every nature whatsoever used for the generation or transmission of motive power * * * are to be provided by the contractor at its expense as provided in the statute."

It also provides that the board of rapid transit commissioners may order additional work to be done or additional materials furnished, and that the reasonable value thereof shall be paid to the contractor; that the motive power for the railroad shall be electricity or compressed air, but it made no provision for the construction of any ducts, ways or conduits in which electric wires might be laid if electricity was chosen as the motive power.

After the execution of the contract it was definitely decided that electricity should be the motive power of the railroad, and the rapid transit commissioners thereupon modified the plans by increasing the width of the tunnel and by directing the construction within the outside wall of the tunnel of vitrified brick ducts at suitable distances, which were designed to carry lead cables containing the wires conveying the electric current necessary to operate the railroad. The ducts thus constructed formed a part of the solid wall.

*Held*, that the rapid transit commissioners had power to direct the increased excavation rendered necessary by the adoption of electricity as the motive power and that such increased excavation was chargeable to "construction" and that the contractor was entitled to be paid therefor;

That the vitrified ducts constructed in the outside wall of the tunnel were also "construction" work and not "equipment," and that the contractor was entitled to extra pay therefor;

That the Rapid Transit Act contemplated that the rights of the city and of the contractor in the railroad property should be kept perfectly distinct and divisible; that the city should own the fee of the tunnel structure and the contractor the "equipment;"

That the "equipment," so far as it related to the tunnel proper, should be, in its essential character, personal property.

*Semble*, that the metal cables which carried the electric wires were "equipment" within the meaning of the statute and the contract.

*Quære*, per LAUGHLIN, J., whether the contractor could be required to pay an additional rental for the privilege of using the conduits.

APPEAL by the petitioner, John B. McDonald, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 23d day of October, 1902, denying the petitioner's motion for a peremptory writ of mandamus.

This application was for a mandamus to require the comptroller of the city of New York to draw and issue a warrant on the chamberlain of the said city for the sum of $400,000 as a payment on account of certain construction work on the Rapid Transit Railroad of the city of New York. There is no substantial dispute as to the facts.

It appears that on the 21st of February, 1900, the relator entered into a contract with the city of New York, acting by its board of rapid transit railroad commissioners, for the construction and operation of a rapid transit railroad in the boroughs of Manhattan and the Bronx, in the city of New York, pursuant to the provisions of chapter 4 of the Laws of 1891, as amended by chapters 102 and 556 of the Laws of 1892; chapters 528 and 752 of the Laws of 1894; chapter 519 of the Laws of 1895; chapter 729 of the Laws of 1896; chapter 7 of the Laws of 1900 (amdg. Laws of 1897, chap. 378, § 45), and chapter 616 of the Laws of 1900; that after the execution of this contract the relator entered upon the work under the contract which is now in progress; that the contract contained no provision for the construction of any ducts, ways or conduits through which might pass the electric wires to be used for transmitting motive power in case electricity was chosen as such power, but provided that " the motive power shall be electricity or compressed air, which shall be so used as to involve no combustion in the tunnels or any injury to the purity of the air in the tunnels," thus leaving the question as to the motive power to be used in the operation of the road to be subsequently determined by the commissioners under the power conferred upon them by the statutes before referred to; that it was contemplated at the time of the execution of the contract, if electricity was adopted as the motive power to be used, that the wires for transmitting the current of electricity should be strung within the tunnel itself; that the relator went on with the construction of the tunnel. The plans upon which the original contract was made show solid walls on the sides of the tunnel of a specified thickness.

On the 27th day of November, 1900, the relator submitted to the board a communication calling their attention to the fact that the motive power to be employed in the operation of the road had not been definitely determined; that at present compressed air was out

of the question as a motive power; that the only practicable method to be considered was electricity; and asking the board to consider the general question whether or not electricity should be adopted as the motive power to be employed in the operation of the railroad. It was also stated that in the opinion of the best experts the electrical power should be delivered to the trains in the form of direct or continuous current through a third rail or equivalent conductor, and that the current should be carried in conduits placed in suitable chambers in the side walls of the subway; that if the board should approve of this suggestion, it would be necessary to authorize the construction of a sufficient number of passageways or chambers in the side walls of the subway to accommodate the electric ducts or conduits which would be required; and plans were submitted to the board showing the proposed construction, by which there were to be constructed in the walls of the tunnel vitrified brick or tile chambers, through which the electrical ducts or conduits were to run; that this plan would require a greater excavation than is provided for in the plans of the railroad by a space of about eight inches on each side of the subway as planned, besides manholes about ten feet long and six feet in width, at intervals averaging about 400 feet; that this change in the plan of construction of the tunnel walls, as well as the additional excavation made necessary by the adoption of a motive power not determined in the contract, and not foreseen when it was prepared, should be regarded by the board as extra work of construction in addition to that called for by the contract; that the conduits or ducts which were to be placed in the chambers referred to would not be a part of the equipment which the relator was under obligation to furnish, but that the change in the construction of the tunnel wall and the additional excavation made necessary by widening the tunnel to fit it to carry the electrical equipment were to be fairly regarded as additional work to that provided for in the contract, and to be the subject of extra compensation. This letter was received by the board and referred to its counsel and chief engineer for report. Plans for the additional work necessary to include the said ducts in the walls of the tunnel were submitted by the relator to the chief engineer of the board and approved by him, and thereupon the relator proceeded to construct said walls as provided for by the modified plan.

Nothing further seems to have been done by the board until the 27th day of September, 1901, when the chief engineer submitted a report approving of the suggestion of the relator that electricity was the most approved form of power, and that by it the road could be operated in the most satisfactory manner, it being stated that it would be impossible to determine at that time how many of the ducts or chambers were required for the construction of the road; that allowance should be made for reasonable expenses, and that as soon as the relator finally adopted the site for the power house and worked out his schemes for electrical distribution, it would be possible to determine the number of ducts that would be required; and in the meantime, in order that the work should not be delayed, he had permitted the contractor to build at his own expense ducts in the walls of the subway. On June 12, 1902, at a meeting of the board, when this subject was brought up for discussion, the chief engineer was asked whether the construction of these ducts was a part of the equipment or of construction, to which he replied that the ducts were a part of the construction; whereupon a resolution was passed by the board — the mayor and comptroller voting in the negative — that it was the sense of the board that so many of these ducts as were necessary for the operation of the rapid transit railroad were a part of said railroad and not a part of the equipment. At the same meeting it appears that the question as to whether the construction of these ducts was a part of the road or of the equipment was referred to the counsel of the board, who reported that in their view the extra expense caused to the contractor by the construction of the walls and the excavations therefor was construction, for which the contractor was entitled to be paid by the city of New York; and the board at a meeting held on the 25th day of June, 1902, resolved that the additional materials furnished or to be furnished, for the purpose of supplying and building the ducts above referred to, shall be regarded as additional work and materials under the terms of the contract, and should be done and paid for as extra work under the contract for construction and operation, and that the cost thereof should be deemed a part of the cost of the rapid transit railway and paid to the contractor as such, and that the chief engineer was directed to have a voucher prepared for transmission to the comptroller for the reasonable value

of such additional work and materials up to the 1st day of June, 1902. It also appeared that in pursuance of that resolution a requisition for such additional work, asking for the sum of $400,000, was prepared by the relator, duly certified to by the chief engineer, and approved by the board, who directed that a voucher be drawn on the comptroller for the amount, which voucher was duly certified to by the auditor and by the president of the board of rapid transit commissioners, and presented to the comptroller, who refused to pay the same upon the ground that the amount called for was for the construction of ducts, a part of the equipment of the rapid transit railroad, and did not constitute extra or additional work to be paid for by the contractor in addition to the price provided for by the contract.

The question presented is whether this voucher, under the statutes and the contract between the rapid transit railroad commissioners and the relator, is for construction or equipment. The statute under which this work is done (Laws of 1891, chap. 4, as amd. as hereinbefore indicated) requires the board of rapid transit commissioners to determine whether the rapid transit railroad should be constructed (§ 4, as amd. by Laws of 1895, chap. 519, and Laws of 1900, chap. 616); that in the event of a determination to construct such road, the board of rapid transit commissioners shall proceed to prepare detailed plans and specifications for the construction of such rapid transit railway in accordance with the general plan of construction, and from time to time alter such detailed plans and specifications, but always so that the same shall accord with the general plan of construction (§ 6, as amd. by Laws of 1896, chap. 729). Section 34 of the act (as amd. by Laws of 1896, chap. 729, and Laws of 1900, chap. 616) provides that in case the people of the city of New York should determine by vote, as provided for by sections 12 and 13 of chapter 752 of the Laws of 1894, that any such railway or railways should be constructed at the expense of such city, then it should be the duty of the said board to proceed with the construction of such railway or railways and provide for the operation of the same; that as soon as the necessary consents had been obtained, the said board for and on behalf of said city should enter into a contract with any person, firm or corporation which, in the opinion of said board, should be

best qualified to fulfill and carry out said contract for the construction of such road or roads upon the routes and in accordance with the plans and specifications so adopted, for such sum or sums of money, to be raised and paid out of the treasury of the city as in the act provided, and on such terms and conditions, not inconsistent with the plans and specifications, as said board should determine best for the public interest; that such contract should also provide that the person, firm or corporation so contracting to construct such road or roads, should at his or its own cost and expense, equip, maintain and operate said road or roads for a term of years to be specified in the contract; that such contract should further provide that the person, firm or corporation so contracting to construct, maintain and operate said road should annually pay into the treasury of said city, as rental for the use of said road, a sum which should not, except as in the act provided, be less than the annual interest upon the bonds to be issued by said city for the construction of said road, and in addition to said interest a further sum which should be equal to a percentage of not less than one per centum upon the whole amount of said bonds. It was further provided that such contract might contain provisions for the valuation of the whole or a part of the property of the said contracting person, firm or corporation employed in and about the equipment, maintenance and operation of said road, and for the purchase of the same by the city at such valuation, or a percentage of the same, should said lease not be renewed; and it also provided that the city in and for which said road should be constructed should also have a first lien upon the rolling stock and other property of the said contracting person, firm or corporation constituting the equipment of said road, and used or intended for use in the maintenance and operation of the same, as further security for the faithful performance by such contracting person, firm or corporation of the covenants, conditions and agreements of said contract. Section 35 of the act (as amd. by Laws of 1896, chap. 729, and Laws of 1900, chap. 616) provides: " The equipment to be supplied by the person, firm or corporation operating any such road shall include all rolling stock, motors, boilers, engines, wires, ways, conduits and mechanisms, machinery, tools, implements and devices of every nature whatsoever used for the generation or transmission of motive power and including all power-houses and all

apparatus and all devices for signaling and ventilation." Section 38 (as amd. by Laws of 1895, chap. 519) provides that the board of rapid transit commissioners may, from time to time, with the consent, in writing, of the bondsmen or sureties of the person, firm or corporation which has contracted to construct, equip, maintain and operate said road or roads, or any of them, agree with said contracting person, firm or corporation upon changes in and modifications of said contract, or of the plans and specifications upon which said road or roads is or are to be constructed.

In pursuance of the provisions of this act, a contract for the construction of the rapid transit railroad was made between the rapid transit commissioners and the relator, by which the relator agreed to fully construct and equip the rapid transit railroad upon the general plans mentioned, and thereafter to use, maintain and operate the same under a lease thereof from the city°for a period of fifty years. Section 8 of the first chapter of this contract provides: " The word ' equipment ' to mean all equipment used or intended for use on the railroad, including all motors, cars, whether used for passengers, freight, express or any other purpose, and all other rolling stock, all boilers, engines, wires, ways, conduits, mechanisms, machinery, power-houses, all real estate upon which any such power-houses shall stand or which shall be necessary for the generation or transmission of motive power, and all tools, implements and devices of every nature whatsoever used for such generation or transmission of motive power, and also all apparatus and devices for lighting, signaling and ventilation, whether such equipment be situate on or near or separate from the railway, provided that the same be used or intended for use in connection therewith, or for any of its purposes, and including all such equipment in existence at any time during or at the end of the term of the lease." Section 13 of the chapter provides: " The word ' construction ' to mean all the work of constructing the railroad, including the doing of work, the providing of materials, the complete furnishing of the equipment of the railroad, the restoration and reconstruction of street surfaces, sewers and other sub-surface structures, and all other work or materials to be done or furnished of every nature whatsoever under the Agreement for Construction." Chapter 2 of the contract provides for the construction of the road by the relator. He there agrees, at his own

cost and expense, and in strict conformity with the specifications, to furnish all the materials and labor necessary and proper for the purpose, and in good, substantial and workmanlike manner, construct the railroad, and also to provide a complete equipment of the railroad according to definition of equipment and according to the specifications, and the city is to pay, and the contractor to receive, for the construction of the railroad the sums specified in the contract. The contract also provides that the board shall have the right, on any section of the railroad, to require additional work to be done or additional materials to be furnished, or both, within the general purview of a rapid transit railroad as described in the copy of the routes and general plan. If such additional work or materials should be required, then the reasonable value thereof should be paid to the contractor. It is also provided that the work to be done and the materials furnished are to be subject to the direction and approval of the engineer. The contractor shall promptly obey and follow every direction within the general purview of the work which shall be given by the engineer, " or if any other dispute, question or doubt as to what is the obligation of the contractor shall arise prior to the time of the complete construction and equipment of the railroad and the declaration thereof by the board, the determination of the engineer shall be binding upon the contractor and the city so far as that the contractor shall, as the case may be, proceed or refrain from proceeding, and without any delay obey the requirement of the engineer. But a determination of the engineer shall not be finally conclusive upon either the contractor or the city  *  *  *  as to the question whether the contractor is entitled to additional payment for anything additionally required by the engineer.  *  *  *  In every such case the engineer shall make his determination in writing and in duplicate, one duplicate to be filed with the board and the other duplicate to be delivered to the contractor. Such determination as to work done or materials supplied on or after the first day of the calendar month next preceding the date of making such certificate shall, if filed with the board within five days after its said date, be binding and conclusive upon the city unless the board shall appeal within ten (10) days after such determination is filed with it, and shall be binding upon the contractor unless the contractor shall appeal within ten (10) days after such delivery to him.  *  *  *

The contractor shall become entitled to additional payment for additional work or by reason of additional specifications, drawings, details or other requirements only upon the production of the certificate and determination of the engineer if unappealed from and certified by the board, or if so appealed from, then only upon and according to the final award of arbitrators, arbitrator or umpire as aforesaid certified by the board." It is further provided that "The city shall pay the contractor for the work as the same progresses upon vouchers certified by the board;" that the amount so certified by the board shall be forthwith paid by the city to the contractor without any deduction and that "full and sufficient equipment, including all rolling stock, * * * subways, conduits and mechanisms, * * * implements and devices of every nature whatsoever used for the generation or transmission of motive power, and including all power-houses, real estate necessary therefor or for the generation or transmission of motive power, and all apparatus for signaling and ventilation, are to be provided by the contractor at its expense, as provided in the statute."

*George W. Wickersham*, for the appellant.

*George L. Rives*, for the respondent.

HATCH, J. :

It cannot, I think, be doubted but that both statute and contract contemplated that the commissioners should exercise very broad powers in providing for the construction of the tunnel and in changing the detail of the plans after the same had been begun. In the exercise of power respecting changes the only limitation seems to be that departure should not be made from the general plan of construction. It logically follows, therefore, that whenever the commissioners, by reason of matters not contemplated when the contract was made, and the exigency of the situation, require a change in method and manner of construction, they have the power to make such change, and the contractor is bound to observe and comply with the directions given concerning it. As motive power was in process of development when the contract was made, it was not definitely determined what power should be used. When this subject was settled, it was agreed that electricity was the only power practicable. The commissioners, when this conclusion was reached,

undoubtedly had the power to make such change as was necessary to conform the tunnel to meet the requirements of electricity as a motive power, and enlarge the same in order to make provision therefor. Consequently, the increased excavation, which was found necessary for the walls of the tunnel in order to accommodate and apply the electric motive power to the best advantage, was clearly within the power of the commissioners to direct, and the work rendered necessary thereby became a part of the construction of the tunnel. Primarily, the construction of the tunnel was to furnish a place for a railroad. The whole purpose is to enable a railroad to be operated in this space, and when the space is excavated, it becomes a place in which to put the equipment of a railroad; and this embraces cars, rails, motive power and all else essential to the complete establishment of the same with the power which moves the trains over its tracks. The increased excavation, therefore, rendered necessary by the adoption of electricity as a motive power was clearly within the power of the commissioners to order the contractor to do, and when done it was properly chargeable to construction.

The vitrified ducts, which form a part of the solid wall of the tunnel, fall within the same category, and if the enlargement of the excavation be construction, the wall is also. I am quite ready to concede that within a strict definition and in a technical sense these ducts, or hollow vitrified brick, may be described as a conduit or way, and, therefore, within the words of the statute; but that is not the controlling consideration. The tunnel is that, and it is properly described as a conduit, or way, for the passage of cars, but because the cars run through it does not make it equipment. The real question is what are these vitrified ducts, within the meaning of the statute and the contract thereunder? It is evident that the statute and the contract provide for two separate things, each one quite independent of the other in fact and in all the essential rights of property. The evident intention is to keep the two perfectly divisible. That part of the tunnel which is construction, the city is to furnish, pay for and own. That part which is equipment, the contractor is to furnish, pay for and own, subject, when provided, to a certain lien on the part of the city for its protection. The entire tunnel proper is regarded as a street, of which the city is the owner

in fee. The contractor cannot own any part of this structure, or have an interest therein, except to place therein a railroad, with the necessary power to operate it. His interest must, of necessity, be a severable, personal property interest in the equipment, which, if not paid for by the city at the expiration of the term of the lease, he may remove as his property. The language of the statute as to what constitutes equipment provides that it "shall include all rolling stock, motors, boilers, engines, wires, ways, conduits and mechanisms, machinery, tools, implements and devices of every nature whatsoever used for the generation or transmission of motive power, and including all power-houses and all apparatus and all devices for signaling and ventilation." (Laws of 1891, chap. 4, § 35, as amd. by Laws of 1896, chap. 729, and Laws of 1900, chap. 616.) Thus showing that the statute contemplated by this recital that the equipment in its essential characteristics should be personal property. So far as it speaks of real property, it is of such property as is independent of the tunnel, use of which is made for the generation and transmission of motive power to the tunnel proper. The property used for the generation of power to be supplied to the tunnel would not have been embraced within the term "equipment" had not the statute so named it. It is essentially real property, necessary for the operation of the railroad; and as it was essential in order to furnish motive power, the duty was devolved upon the contractor to furnish it, and upon that, the city was given a lien as well as upon the equipment used in the tunnel. The title to this property, whether real or personal, is in the contractor, and upon it the city is given a lien. It is incomprehensible that the city can have a fee in real property and another person own a part of it at the same time. Either the city's property right in the tunnel is less than a fee, and the contractor has a property right therein, or else that which forms an integral part of the tunnel is owned by the city, and, if so, must necessarily be a part of the construction. It must be conceded, I think, that the commissioners had the power in the original plan to construct the side walls of the tunnel entirely of hollow, vitrified brick, whether thereafter used as a receptacle for the conduits proper, or not. If such had been the plan, it could not be contended but that the wall itself, even though constructed of hollow

brick, would be a part of the construction. It could have constructed the walls of the tunnel of solid brick, leaving holes therein, through which the conduits transmitting the power could be placed, and no one would then contend but that the wall was construction, even though used by the contractor as a place for his conduit. What the commissioners could do in the beginning, they could do during the progress of the work with the same force and effect as though it was originally planned. What they did was to change the plan by providing for the enlarged excavation. There was then constructed a wall next the side of the excavation made of hollow brick coated with water proofing. Next this structure was placed the vitrified ducts, inclosed in mortar. On the outside of this and forming the inner wall of the tunnel, has been placed a mass of solid concrete thirteen inches thick, the *whole* inclosed at top and bottom in a solid mass of concrete and mortar. As the wall reaches the stations constructed along the line, the vitrified brick ducts are carried under the floors of the stations and covered over with about three inches of concrete, over which is placed a tesselated floor; and leaving the station, the vitrified brick ducts again enter the continuing wall. This whole construction is as firm and solid a part of the structure as are the steel supporting columns — is as much an integral part of the whole as is the roof which spans the top.

Upon what principle of law can it be held that the contractor owns under the terms of this contract a part of this structure, and how, if vested with such ownership, can the city have a fee therein? The conduit which conveys the motive power to run the railroad consists of lead tubes lined with copper, in which run the electric wires; and the actual conductor of the power is drawn through the ducts from the manholes. Because the vitrified brick chambers are used as receptacles for this conduit does not make it a part of the equipment any more than does the open space of the tunnel make it equipment because the cars run therein; and the ducts do not become any less a part of the solid wall because they are used for holding the conduits which carry the live electric wires. As we have before observed, the contract itself contemplated a severable interest of property rights, distinct and independent. No construction of it ought, therefore, to obtain which makes such rights joint, instead of several, and which gives a part ownership in the fee of the

tunnel, when the statute vests it absolutely in the city. It is to be borne in mind that at the expiration of the lease the city is to take and pay for the equipment, and intermediate that time it has a lien thereon. It must follow that if the city for any reason refuses to take and pay for the equipment upon the termination of the lease, the contractor will have the right to remove the same. He has title to the property and is either entitled to be paid for the same, or have the right to take possession. This is his legal right, if he has title thereto. The city upon its part is authorized to enforce its lien against the property of the contractor and is invested with all legal remedies in enforcement of the same, in the event that the contractor is guilty of a breach of the contract. Suppose the city forecloses its lien and sells the vitrified brick, which has become an integral part of the wall, what would it deliver to the purchaser, and how would the latter get possession of the property thus sold? A judgment of foreclosure would not provide for a destruction of the wall of the tunnel as it would not be the appropriate relief in such an action, and a purchaser could take nothing unless he acquired the right to destroy a portion of the wall. Certainly, neither the statute, nor the contract, contemplated such a result. The presence of the vitrified brick does not make the structure any less a wall nor change its permanent character, nor is it more or less a way or conduit than the place where the rails are laid and the cars operated. By the provisions of the contract, the contractor is not to furnish equipment until after two-thirds of the work of construction is done. This clearly contemplates that the tunnel should be excavated and the walls finished before the contractor should begin to supply equipment, and the same thing is true as to the schedules of equipment, which he is required to file. Clearly, therefore, the contract contemplates that equipment was considered as something entirely aside from and independent of the permanent structure constituting the tunnel proper. Such provision is inconsistent with the idea of ownership of any part of the permanent structure of the tunnel. The metal tubes which carry the electric wires answer completely the statutory definition of equipment and the terms of the contract. This is introduced after the structure is completed, and may be removed therefrom without damage to the structure or interference with its integrity. It is property to which

a lien can attach, and upon which it may be enforced. There is no inconsistency of title as to it, even though it passes through the walls of the tunnel. Such view harmonizes the provisions of the statute and contract as to what is essentially construction and what is essentially equipment. I am not able to see that any other view does, so far as this matter is concerned. Equipment in this respect can be introduced after the tunnel is completed. The vitrified brick cannot be so introduced; when it is introduced it becomes a part of the permanent structure.

It seems to me, therefore, that as the commissioners could have originally authorized the enlarged excavation, and this method of constructing the wall for the purpose for which it is to be used, they possessed the same power after determination was made to use electricity as the motive power, and they had then the same reserved power to direct the construction of both tunnel and wall in this manner as they had in the beginning. When the commissioners so determined, the contractor had no alternative but to obey and construct the tunnel and its walls in that particular manner. The engineer in charge of the work and every one in authority have placed this construction upon the statute and the contract, and determined what is the physical fact, that this vitrified brick was an integral, inseparable part of the wall. Being such, the city has the absolute title to the whole structure, and it seems to me absurd to say that the contractor can have any ownership therein or the city any lien thereon. If this view obtains, it necessarily follows that the contractor became entitled to be paid for the items for which the warrant was directed to be drawn. There are some small items of steel, expanded metal and cast iron, which the record does not make clear whether they are a part of the structure. I do not understand, however, that there is any dispute but that the contractor is entitled to be allowed those items, as forming a part of the construction if our view obtains as to what constitutes equipment and what construction. If otherwise, as to these items an alternative writ would be necessary.

If these views are sound, it follows that the order should be reversed, with ten dollars costs and disbursements, and the writ directed to issue, with fifty dollars costs.

VAN BRUNT, P. J., and McLAUGHLIN, J., concurred.

INGRAHAM, J. (concurring):

I concur in the conclusion of Mr. Justice HATCH. The scheme adopted by the statute imposed upon the board of rapid transit commissioners extensive power in the construction of this road. They were to provide the plans by which the road was to be constructed, and necessarily were to determine the width of the cut, the thickness of the walls and just how they were to be constructed; and from time to time, as the construction proceeded, they had authority to change the plans or the method of construction. The construction of the subway was to be paid for by the city; the equipment of the road was to be paid for by the contractor; and the statute defined what should be equipment and what should be construction. The contract that was made carried this definition of equipment into it. It cannot be doubted but that the board and the engineer had power to change the plans for the side walls of the tunnel and provide that they should be thicker than provided for by the original plans and contain open spaces to be used for the conduits by which the electric power was to be carried to the cars to be used in operating the road. I quite agree with the court below that neither the board nor the engineer could call that construction which was in reality equipment, and compel the city to pay for it; but the board had the right to determine how the side walls of the tunnel should be constructed and that it should contain spaces to be used for the ducts or conduits for the electric wires, and such a provision would not make the whole wall a duct or conduit, nor the cost of constructing the wall cost of equipment. When the rapid transit commissioners determined that the walls should be built wider than at first contemplated, and in that wall there should be left a space to be used for a conduit, it determined the question of the construction of the wall which was an essential part of the subway construction. I think we should look at this wall as if its present method of construction had been provided for by the original plans, as undoubtedly it would have been if at the time the original plans were made it had been determined that electricity should be used as the motive power, and that the safe and efficient operation of the road required that the ducts for the transmission of this power should be inserted in the wall; and in that case I do not think it

would have been claimed that the cost of the construction of the wall should be charged to equipment. The fact that the determination by the board to adopt electricity as the motive power, and that the proper method of supplying such electricity to the cars was by ducts or conduits built into the wall, could not, upon any principle, make the cost of the necessary excavation or the building of the wall a part of the equipment any more than if the board had originally determined to build the wall as it is now built. It is still the wall of the subway, which is a part of the construction of the road itself, and the cost of building that wall seems to me to be clearly a cost of the subway itself, and not equipment. The cars to be used in the operation of this road are clearly equipment to be furnished by the contractor. If after the plans had been prepared it had been determined to run cars considerably higher than originally contemplated and in consequence of that change in the height of the cars it had been necessary to increase the height of the subway, I think that the cost of building the increased height could not be called equipment, although such increased height was made necessary by the equipment to be furnished by the contractor, and so the fact that the adoption of electricity required that the walls should be thicker so as to contain the ducts or conduits through which the electric wires were to run would not make the walls themselves conduits or the increased cost of building the walls the cost of equipment.

The modified plans, as adopted, provided that there should be inserted in the walls a vitrified brick chamber or duct through which the wires should be placed which carried the electricity from the outside of the tunnel to the cars. The photographs and plans, a part of the record, show clearly this method of construction. I was inclined to think that these vitrified brick conduits or ducts would come within the definition of equipment which is contained in the statute. They are to be used to carry the electric wires and thus be "ways, conduits and mechanisms, * * * used for the * * * transmission of motive power," and as such equipment under section 35 of the act (Laws of 1891, chap. 4, as amd. by Laws of 1896, chap. 729, and Laws of 1900, chap. 616). There is, I think, a distinction between the wall of the subway and these ducts or conduits inserted in the wall. One is essentially a neces-

sary part of the subway.   The other is essentially a part of the equipment, and whether these ducts were placed inside the wall or outside the wall, they had no relation to the construction of the road itself, but were there solely for the purpose of furnishing a method for the transmission of the electric power.   Section 35 (*supra*) provides that " wires, ways, conduits and mechanisms, * * * and devices of every nature whatsoever used for the * * * transmission of motive power " shall be equipment.

As, however, the corporation counsel conceded on the argument that this was all construction or all equipment, and as I am clearly of the opinion that the walls are construction and not equipment, I concur in granting the application.

LAUGHLIN, J. (concurring) :

I agree with Mr. Justice HATCH that the relator is entitled to recover of the city the cost of the extra excavation necessitated by the change of plans incident to placing the conduits for the electrical cables in the side walls of the tunnel and of constructing the vitrified hollow tile conduits or ducts.

During the argument it occurred to me, but the point was not made by counsel for the respondent, that it would be inequitable to decide that this extra work was construction, the entire cost of which must be borne by the city, for the reason that if the contractor is to be permitted to use these conduits without paying rental to the city, other than the low rate of rental provided for on all construction originally contemplated to be made by the city, and on which his competitors, in bidding, figured, he is saved a tremendous outlay of money, it having been his duty, under the statute and contract, before the alteration thereof, to construct all conduits that might be necessary for carrying the electrical cables, as part of the equipment and at his own cost and expense.   It would seem that this question should have been considered by the board of rapid transit railroad commissioners before consenting to a change of the plans, or rather before consenting to a change thereof upon the understanding that the contractor was to be permitted to use the conduits constructed in the side walls free of special rental or other charges.   Of course, if the commissioners deemed the construction of these conduits in the side walls sufficiently beneficial and advantageous to the city to justify

them in paying the entire expense thereof, even if the contractor refused to pay a rental therefor, they not only had the power, but I think they might properly have consented to the construction at the expense of the city; but it does not appear that they endeavored to obtain from the relator an agreement to pay the fair value of the use and occupation. However this may be, the propriety of the action of the commissioners is not presented for review. The learned corporation counsel expressly stated on the argument that the respondent does not contend that the payment of this claim may be resisted upon equitable grounds, but concedes the contrary, and bases his action solely upon *want of power* on the part of the commissioners to change the plans and contract and require this additional excavation and the construction of these conduits at the expense of the city. It is thus conceded that there is no reason for withholding the writ on discretionary grounds; that all facts relating to the right of the relator to payment for this work are fully presented by the moving papers and raise a question of law pure and simple, depending solely on the *power of the commissioners*, and that no question concerning the improper exercise of such power is involved. Nor is it claimed that the comptroller, in refusing to honor the voucher, exercised any judicial, discretionary or other than ministerial power, or that the relator should be left to an action at law. By stating these concessions on the part of the corporation counsel, I am not to be understood as disagreeing with him. They are merely stated for the purpose of showing that the questions which would otherwise require consideration and an expression of opinion by the court have not been investigated by me, and I express no opinion thereon. The single problem thus presented on the appeal is not difficult of solution.

That this method of construction is superior, and will tend to insure greater safety to passengers and those working in the tunnel as well, is manifest. Had the idea been thought of, or suggested originally, there can be but little doubt that it would have been adopted then. We cannot say that the change of plan was made solely for the benefit of the contractor. I think the fair inference is that it is for the benefit of the city and of the public as well. It does not appear how long this tunnel will last, but the fair inference is that it will last much longer than the period of fifty years, over

which the lease to the contractor extends, and, probably, by repairs and reconstruction from time to time, it will last indefinitely. Moreover, express authority is found in section 6 of the Rapid Transit Act, so called, as amended by chapter 729, Laws of 1896, for making provision in the plans for the present and future needs of the public for sewers, gas or water pipes, or electric wires underneath the surface of the streets under which the railroad is to be constructed, and for the city's charging rental for such use where the right to such use of the street without compensation did not exist. The learned counsel for the relator cites this as authorizing the construction of those conduits and the renting of such of them as may not be needed by the relator. I think authority may there be found for renting to the relator such of them as he needs. It appears, and is not controverted, that at the time the legislation was applied for, and when the contract was made, it was not contemplated that any permanent conduit would be necessary for conducting the electrical cables, but it was then intended that they should be suspended or placed in the interior of the tunnel, and remain of a movable nature. These were the circumstances under which it was provided by the Legislature and by the contracting parties that whatever conduits might be necessary for the operation of the road should fall within the classification of equipment, the expense of which should be borne, in the first instance, by the contractor, the same, however, to be purchased by the city at a fair valuation at the expiration of the lease. The conduits then in contemplation were to constitute *equipment*, and upon them as well as the rest of the equipment the city was to have a lien to insure the performance of the contract. By the contract and plans as changed by mutual consent, however, certain conduits suitable for holding the electrical cables, to enforce payment for which is the object of this proceeding, have become a *permanent* part of the construction and *irremovable* without the destruction of the side walls of the tunnel. These conduits thus forming a part of the permanent construction, do not, in my opinion, necessarily fall within the classification of equipment as used in the statute or in the contract. The commissioners may well have deemed that it was to the benefit and advantage of the city in its future operation of the road after the expiration of the lease, to have suitable conduits in the side

walls for use in transmitting power.   I think if the plans had originally so provided there could be no question but that it was the duty of the contractor to construct them; and it being his duty to furnish all conduits for equipment at his own expense he could not then use them without the consent of the city or its authorized representatives.   Whether the contractor is or should be entitled to use these conduits for the electrical cables employed in transmitting the power is a separate and distinct question not necessarily presented on this appeal, which, as has been seen, involves only the *power* of the commissioners to require their construction.   The commissioners had power under the statute and reserved in the contract to alter and change the plans with the consent of the contractor.   We are not concerned with the question whether the contractor could have been compelled to submit to a change of the plans so as to provide for the construction of these conduits solely for the benefit of the city for three reasons : *First,* the change was made at his suggestion; *second,* he has consented to it, and, *third,* most of the work was done by him at his own risk before the commissioners formally authorized the change or determined to allow him compensation therefor as part of the construction.   Thus the question comes before us as if these provisions had been in the original contract and there had been no express provision that the contractor should have the use of the conduits gratuitously.   One of the grounds upon which the relator recommended this change in the plans is that it will insure greater safety to the public; and this is undoubtedly true.   Suppose in addition he or the chief engineer of the board had also recommended that it would be to the interest and advantage of the city on grounds of economy on account of the inpracticability of making these changes after the expiration of the lease without incurring several times the outlay that will be required in doing the work now, and suppose the contractor on account of its being to his advantage also had offered to pay the fair rental for the use of the conduits — could there be any doubt of the power of the commissioners, with the consent of the contractor, to make the changes for three reasons ?  Is the power of the commissioners in that regard any less because they may intend to permit the contractor to use the conduit without paying rental ?  Is it not apparent that this question as to the use of the conduit by the relator

is separate and independent from the power to authorize their construction? The contract expressly provides, as shown in the affidavit of the relator, that "the railroad hereby leased includes the railway constructed under the routes and general plan * * * together with terminals, stations and all other appurtenances whatsoever of the said railroad, *but not including the equipment thereof.*" Thus it appears that the contractor not only agreed to furnish all equipment, including conduits, at his own cost and expense, but it was expressly provided that the city did not lease to the contractor *any equipment.* Therefore, although these conduits are now part of the permanent construction and belong to the city, they will, if used by the contractor, serve the purpose of part of the equipment which it was originally contemplated was to be furnished and paid for by him; and for the purpose of any application on his part to use them they should be considered as equipment within those provisions of the contract requiring him to provide equipment at his own cost and expense; and since the conduits are not leased to the contractor, he must acquire his right to use them for he has not that right under the statute or contract as originally made at least. The relator claims that this is new construction and in this contention we agree. It, therefore, follows that he cannot use it as equipment as a matter of right, for the city has not agreed to lease equipment, and the use he contemplates making of it is clearly equipment within the fair intent and meaning of the contract and according to the understanding of the parties at the time the contract was made, which, as shown by the moving papers, contemplated the suspension of the cables within the tunnel. The metallic cables inclosing the copper wires or other electrical conductors are not conduits, but those openings in the side walls will be if used for carrying such cables. This construction will result in justice to both parties; the contract permits it and equity requires it. It appears that the expense of providing suitable conduits or conductors for the electrical cables which was to be borne by the contractor would be very large; and some idea of this expense may be inferred from the fact that the contractor proceeded with and performed nearly one-half of this work of inserting conduits in the side walls, the aggregate cost of which, according to the affidavit of the chief engineer of the board, will be $1,150,000, before obtaining the formal approval of

the commissioners to a change of the plans or arriving at an agreement as to who was to pay therefor, and during several months he was proceeding under a resolution which required him to bear the entire cost thereof. It is, therefore, just that in being saved this large expenditure of money and greater protection against the liability of accidents he should pay a rental to the city for the use of these conduits; and it is right that the city should pay the cost of construction, since they become its property permanently affixed in the construction and useful beyond the period of the relator's lease. The contractor in dealing with the commissioners is chargeable with knowledge of the limitations of their powers; and it seems to me that they have not, by failing to have an understanding with him with respect to paying rental, foreclosed the city from asserting a right to recover the fair value of the use of these conduits. All of the provisions of the statute and of this contract have not been drawn to our attention upon this appeal; but unless there are other provisions of the contract, not printed in the record, or of statutes, to which our attention has not been called, controlling on the point — I think that the commissioners were not and are not justified in permitting the contractor to use the conduits without paying the city any rental therefor. The commissioners may have led the contractor to believe that he is to be permitted to use these conduits gratis; and, if that be the effect of the amended contract and plans, then the question of power on the part of the commissioners to permit such use without compensation to the city, perhaps embarrassed by a question of estoppel in not having a clear understanding on the subject, may arise in the future, but it is not directly presented and cannot be decided now. However, that does not affect the power of the commissioners, with the consent of the contractor, to make the changes in the contract and plans and to obligate the city to pay for the work required thereunder. For these reasons, therefore, I vote for a reversal of the order and for awarding a peremptory writ of mandamus according to the prayer of the petitioner.

Order reversed, with ten dollars costs and disbursements, and motion granted, with ten dollars costs and disbursements.