THE PEOPLE ex rel. THE THIRD AVENUE RAILROAD COMPANY, Appellant, *v.* JOHN NEWTON, as Commissioner of Public Works, Respondent.

Whenever privileges, granted by the legislature to a corporation, come under review in the courts, they are to be strictly construed against the corporation; nothing passes but what is granted in clear and explicit terms.

To authorize the granting of a writ of *mandamus* requiring a municipal officer to obey the direction of a private corporation in regard to the management of streets intrusted to his care, the relator must show a clear legal right to the writ.

This right may be inquired into both by the officer moved against and by the tribunal applied to.

In January, 1853, the board of aldermen of the city of New York, by resolution, granted to certain parties the right to lay a double track for a railroad in certain specified streets in said city, upon certain conditions, among them, that no steam power be used on any part of the road for propelling cars. The relator was thereafter incorporated under the General Railroad Act (Chap. 140, Laws of 1850), and to it the persons named in the resolution assigned the right so granted. Relator, immediately thereafter, laid its tracks on the surface of the streets, and ran cars thereon drawn by horses. In 1887 the relator, proposing to move its cars by means of cables passing under the surface of the streets between the rails of each track, to be operated by a stationary steam engine located upon its property outside of the streets, applied to the commissioner of public works for a permit to make the necessary excavations in the streets as required by the Consolidation Act (§ 322, chap. 410, Laws of 1882), which was refused. *Held* (EARL, PECKHAM and GRAY, JJ., dissenting), that the relator was not entitled to a *mandamus* directing the granting of such a permit, that it acquired neither by its charter nor the resolution or the acts confirming the same (Chap. 140, Laws of 1854; chap. 10, Laws of 1860), a right to open, excavate or use below the existing surface of the streets, save for the temporary purposes of laying its tracks, and for necessary repairs thereafter; and that the permit was properly refused.

(Argued December 11, 1888; decided February 8, 1889.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made May 18, 1888, which reversed an order of Special Term granting relator's application for a peremptory writ of *mandamus* directing the

defendant, as commissioner of public works·in and for the city and county of New York, to grant to the relator "a written permit and authority to begin and continue excavations along its route for the purpose of laying cables in each track between the present rails as motive power for its cars," and which denied the application.   (Reported below, 48 Hun, 477.)

The material facts are stated in the opinion.

*John E. Parsons* for appellant.   The adoption of the use of horses by the Third Avenue Company did not exhaust its power for the selection of a motor or prevent it from adopting a new motive power from time to time, always provided that such motor does not come within the exception.   (*McCartney* v. *C. & E. R. R. Co.*, 112 Ill. 611; 29 Am. and Eng. R. R. Cases, 326; *H., etc., R. R. Co.* v. *Philadelphia*, 89 Penn. St. 210; *Fowler* v. *Pratt*, 11 Vt. 369; *Cheshire Turnpike* v. *Stevens*, 10 N. H. 133; *Bruce* v. *Canal Co.*, 19 Barb. 371; *Selden* v. *Canal Co.*, 24 id. 362; *Mononguhela Br. Co.* v. *Kirk*, 46 Penn. St. 112; *Parker* v. *Dam Co.*, 20 Me. 353.) The restriction in the grant neither in terms nor in intention can be held to prohibit the use of steam power absolutely. With reference to the significance of the term "mechanical power" in the charter, it should be construed to have comprehended the cable system of motive power, and that the cable principle was present in the minds of the parties using such language.   (Lighthall's Cable Traction Co's. Pamphlet, containing extract from Snowdon Patent granted 1824, p. 5 and plate 1; Extract from Civil Engineers and Architects' Journal [1839] p. 9, on the Origin of Cable Roads; Report on Locomotives and Fixed Engines, 1831; Brandling Patent Specifications, 1846; Parkin Patent Specifications, 1846; Journal of Asso. of Engineering Society, containing description [1852] of the London and Blackhall Ry.)   Other acts in *pari materia* are legally to be considered in determining the intention of the legislature in the act of 1850, and of the city authorities in the grant of 1853.   (7 Mass. 523; *Blake* v. *Wheeler*, 18 Hun, 496; *O'Rourke* v. *People*, 3 id. 225

*Goodrich* v. *Russell*, 42 N. Y. 184; Sedgwick on Con. of Stat. and Const. Law [2d. ed.] 215; *President* v. *People*, 9 Barb. 170.) The grant does not forbid steam power altogether. It is steam power "on the road," or locomotive steam power. (*Stranahan* v. *Sea View R. R. Co.*, 84 N. Y. 308.) In considering the question the maxim *in jure non remota causa, sed proxima spectatur* applies. (Bacon's Max. 1; Broom on Legal Max. 216; *Marble* v. *City of Worcester*, 4 Gray, 395.) Horse railroads, although not known or thought of in 1813, are held not to impose an additional servitude, the reason being that they promote, not interfere with the use of the streets for purposes of passage. (*Newell* v. *M., etc., R. Co.*, 24 Am. and Eng. R. R. Cas. 298; 35 Minn. 112.) A reasonable construction is to be given to the words of the common council and of the legislature now under consideration. (*N. C. C. R. Co.* v. *Lakeview*, 105 Ill. 213.)

*James C. Carter* for respondent. To justify an appropriation such as the relator seeks to make of the streets and avenues in question, it must be shown that the legislature has authorized it, either by the express language of some statute, or, if implication may be resorted to, by a necessary implication from the language of some statute. (*In re City of Buffalo*, 68 N. Y. 167; *In re B. & A. R. R. Co.*, 53 id. 574.) The only license or grant ever obtained by the relator from the common council of New York for its road is that embraced by the resolution of the common council of the city of New York of December, 1852, and this would have been wholly void and inoperative but for the subsequent confirmation by the act of 1854. (*Davis* v. *Mayor, etc.*, 14 N. Y. 506.) The grant is a public one and must be strictly construed against the grantee. Whatever is not distinctly given must be deemed to be withheld. (*Stourbridge Canal Co.* v. *Wheeling*, 2 B. & Ad. 792; *Rice* v. *M. & N. R. R. Co.*, 1 Black. 358; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *A. & C. P. Road Co.* v. *Douglass*, 9 id. 444.)

Danforth, J. It is not essential to a proper treatment of this appeal, to determine whether the relator is tied down to a particular method of operating its road — whether its cars may be drawn or propelled — nor whether, if motion is to be given by traction, the pulling shall be done by horses, as at present, or by some other power, animal, mechanical or vaporous. These questions admit of much argument, and, possibly, some doubt. But, if it should be conceded that its cars may be towed by cable, we should be as far from the solution of the controversy between the parties as if we had not been appealed to. It is our province to determine whether a public officer has mistaken his duty, in omitting to obey the direction of a private corporation in regard to the management of streets intrusted to his care, and whether the court below, in refusing to vindicate the corporation, has misconstrued the grant by which the relator obtained the franchise under which it seeks to justify this application. The governing principles in such a case are: (1st.) The relator must show a clear legal right to the writ. (*Morthorst* v. *N. Y. C. & H. R. R. R. Co.*, 66 N. Y. 609; *People ex rel. Slavin* v. *Wendell*, 71 id. 171.) (2d.) Whether it is entitled to have the thing done, may be inquired into both by the party moved against and by the tribunal applied to. (*People ex rel. Freer* v. *Canal Appraisers*, 73 N. Y. 443.) (3d.) The terms of the grant, conferring the right which is asserted, are to be strictly construed, and the privileges it confers cannot be extended by inference; if there is any ambiguity, it must operate against the company, the general rule being that the grant shall be construed most strongly against the party claiming under it, and every reasonable doubt resolved adversely to it. Nothing is to be taken as conceded but what is given in unmistakable terms; and, as was said in *Langdon* v. *Mayor, etc.* (93 N. Y. 145), "whatever is not unequivocally granted is deemed to be withheld," nothing passing by implication. The affirmative must be shown. The court is not to search for any hidden meaning (*Auburn, etc., Plank Road Co.* v. *Douglass*, 9 N. Y. 444;

*Langdon* v. *Mayor, etc., supra*), and coming directly to the case at hand, " whenever it has been considered necessary or proper to allow a highway or street to be used to any extent for the purpose of a railroad, the right has been conferred in express terms." (*Davis* v. *Mayor, etc.*, 14 N. Y. 519.) And it is well settled that, without legislative authority, a railroad corporation has no right to interfere with any public road or street.

In the present case the relator's claim, as described in its petition, stands upon a resolution of the aldermen of the city of New York, passed on the 18th day of December, 1852, and called by the relator the " Van Schaick Grant," by which privileges were conferred on the relator's assignors, and afterwards confirmed and made effective, as it is claimed, by the legislature. (Laws of 1854, chap. 140 ; Laws of 1860, chap. 10.) The relator was incorporated in 1853, under the General Railroad Act (Laws of 1850, chap. 140), and thereafter received, by assignment from the persons named in the resolution, the grant which, as the petition asserts, " constitutes its right to own and operate a railroad " over the route in question. Its franchise of being a corporation, therefore, was derived from the act of 1850, and its powers and privileges as such are limited to those defined in that act and the resolution already referred to. By the resolution it was authorized " to lay a double track for a railroad " in certain streets in the city of New York, under the direction of the street commissioner, upon condition, among others, that it should keep in good repair the space between the tracks and a space two feet each side of the same in each street in which the rails are laid, and also that the tracks be laid upon a good foundation with a rail even with the surface of the streets, portions of the road to be completed within a time specified, and a certain other portion " as fast as the Third avenue should be graded and in a proper condition to lay rails thereon." There was a further condition that " no steam power be used on any part of the road for propelling cars." The relator in 1853, and immediately on receiving this grant, complied with its conditions

and laid its rails upon the surface of the streets through which it was authorized to operate, and adopted the system of traction by horses as a means of furnishing motive power for the running of its cars, and has in that manner continuously operated its road to the present time. It is obvious that the charter, as thus analyzed, contemplates only a road whose operations, by way of structure or otherwise, shall be limited to the surface of the roadway. It gives no right to open or excavate or use below its existing surface.

The General Railroad Law (Laws of 1850, chap. 140), gives no authority for the construction of street railroads (§ 28, sub. 5), but if any right is gained by an organization under that act the company is required after construction to restore the street touched by them "to its former state or to such state as not unnecessarily to have impaired its usefulness." The only disturbance of the street, therefore, which is allowed by the charter or the statute is the temporary excavation required for imbedding the ties and stringers which support the track and rails, and when they are put in place the work of restoration leaves the surface of the street unbroken, the passage-way even and the substructure solid. Such is the road which the relator was authorized to construct and which it did construct. In February, 1887, however, with no additional power or grant from the legislature or the municipal authorities, it resolved, in the language of its directors, "to adopt and," as they say, "did adopt the cable system as a means of furnishing a motive power for the operation and running of cars along its route." We are not informed of the component parts of that system. But the relator, in order to carry forward its scheme, as disclosed by the action of its directors, demanded from the commissioner a permit, as something to which it was of right entitled, to make immediate excavations in and at frequent intervals of space across the public streets through its entire route. No license or word of permission to do so can be found in the charter. The road was completed. The relator had then no

right to again disturb the surface of the streets, except for necessary repairs and replacing of its ties and rails as occasion might require for the proper maintenance of its road. That power it had. No more. It now, however, asserts a legal right to make excavations, not for any of the purposes of its track or roadway or the foundation of either, but for the purpose of laying a cable in each track between the present rails as motive power for its cars by the agency of steam from stationary engines. A mere statement of the proposition should be a sufficient answer to the claim. To open a city street for the construction of a surface railroad track, or its reparation, and to open that street for the introduction of a power to operate the road, would seem to be separate and distinct things. In the first the excavation ends with the construction, the material of the street is replaced, or, in lieu of it, some other substance which restores the surface to its original unbroken condition and usefulness and leaves all below the surface to such uses as the municipality may require.

In the other case, as the record discloses, the cable requires a conduit of mason work, the necessary excavation for which, on a straight road without curves, is six feet wide and from four to five feet deep ; where there is a double track there must be two of these trenches, and at intervals of thirty-five feet along the whole distance, they must go still deeper for drainage, and where there are curves the width of the excavation must be, at least, from twelve to fifteen feet ; at a corner the pit will be thirty feet in width, and at the engine-houses, whence the cable extends to the conduit in the street, it will be necessary to excavate the entire street from the engine-room out to and beyond the track furthest from it. None of these things are required for the construction of a street surface railroad ; none of them affect even its operation. They relate to some act or thing to be done below the surface. Moreover, the entire surface is never to be restored — a slot opening from one-half to five-eighths of an inch will remain through the entire length of each track — an opening sufficient to receive the calk of a horseshoe and be the occasion

of injury — to receive water and communicate frost to the water or gas pipes or other pipes in the neighborhood of the trenches. Other consequences follow. It is enough, however, that the slot furnishes an obstruction to the usual and ordinary use of the street for traffic and travel, whether the horse moves along or across the track, as he may lawfully do.

In the case of *People ex rel.* v. *Thompson* (98· N. Y. 6) we held that no interference with the streets of the city, however slight, could be allowed in the absence of unmistakable language from the legislature permitting it. Yet it is the privilege of interference by excavation in those streets, in the manner I have described, which the relator claims as a right. It alone was the subject of its application to the commissioner, and his refusal to suffer it is the only ground upon which the writ of *mandamus* was invoked; and if this appeal succeeds, the only command which can follow is that the relator be permitted to go on and make that excavation. There is no other question at issue. The city has as much and the same right to deny this use of its streets as a private owner would have to dispute the use of his property. (78 N. Y. 524.) Whence, then, does the relator derive the reason for its contention?

I have examined, with great interest and care, the elaborate, and upon other points instructive, brief of the learned counsel for the relator, but find nothing in it to answer the question I am now considering and which was forcibly presented by the learned judge at General Term, and in the most explicit terms in behalf of the respondent upon this appeal. We are referred to no express words conferring the power sought to be exercised, nor to any words in the grant or the act of 1850 from which, if the law permitted it, an inference to that effect could be drawn by the exercise of the greatest ingenuity. On the contrary, every word and condition is against it. I do not think that the General Railroad Act (Laws of 1850, chap. 140) has any application to the relator's road. If it had, it is difficult to find any reason for the provisions of the act of 1854 (Chap. 140) relative to the construction of railroads in cities, or the act of 1860 (Chap. 10) relative

to railroads in the city of New York, or many subsequent ones relating to the same matter. But assuming that it does apply, we are referred only to so much of it as declares (§ 28, subd. 7) that every corporation formed under its provisions shall have power "to take and convey persons and property over its railroad by the power or force of steam or of animals, or by any mechanical power, and to receive compensation therefor." What has that to do with the question as to the right of the relator to first excavate and then build in the streets of the city the structure, already described, without the consent of the city and without compensation to it? I am quite unable to gather any intimation of a permission to the relator to go under or beneath or to break into the streets even, except for the necessary purpose of laying its tracks. The act (1850, *supra*), whatever else may be said of it, relates entirely to a surface road, and might as well be invoked as authority for tunneling the streets for the passage of the relator's horses attached by machinery to cars as for trenches for a cable. The shaft would differ in size only. Nothing of the kind is permitted.

By the act of consolidation relating to the city of New York (Laws of 1882, chap. 410), it is provided that the common council shall have power, among other things, "to regulate the opening of street surfaces, the laying of gas and water mains, the building and repairing of sewers and the erecting of gas lights." (§ 86, sub. 5.) They may also regulate the use of the streets for telegraph posts and "other purposes" (§ 86, sub. 8), among which, when duly authorized, would doubtless come the one proposed by the relator; and, by section 322, a removal of a pavement or of a street surface for any purpose is forbidden, until a permit is first obtained from the department of public works. The exercise of this care and authority involves judgment and discretion on the part of the city officers. As construed by the relator, its grant requires the abrogation of these powers and duties, and their surrender into the hands of a private corporation. A demand so extraordinary and subversive of necessary

municipal control should be yielded to only when required by the explicit direction of the legislature. We are referred to none. On the contrary, the streets in the city of New York are so regulated and controlled by statute that the fee is in the corporation of the city, in trust, indeed, that the same be kept open for the public. But, subject to that obligation and the easements belonging to the abutting owner, it can be deprived of no use of its surface, or the soil beneath, or the air above it, save by its own consent or the action of the legislature, and may retain the exclusive use and have protection against interference with either, to the same extent that a private person might if he owned the fee. But if the appellant's claim is good, this is all lost. If the relator may occupy so much of the space under the surface of the street, as is now required, why may it not occupy to the same depth under the entire surface of the street from curbstone to curbstone, nay, even to the inner edge of the sidewalk, and, if to the depth now claimed, why not still deeper, to the entire exclusion of its use for the various purposes to which the city authorities now in fact apply the streets, and such other purposes as the necessities of a city demand, and the invention of its people supply, and thus the grant of an easement upon the surface of the street be so expanded as to take in whatever may be below its surface.

That the present claim is for a road, as to one part surface, and as to another part subterranean, will not, even if successful, conclude the relator from going deeper and putting the whole underground, or even from laying a new track beneath, still retaining the one upon the surface. It is claimed, however, that under the general grant of the act of 1850 (§ 28, *supra*) cable power may be used, and it is shown that at about the time of the passage of the resolution of the common council, it was publicly known that cars were in some cases moved by cable. The affidavits in this case disclose that fact; but they also state that the cable system then in use was made effective by "cables fastened to the end of the car and running along

the surface of the road between the rails," with power supplied by a stationary engine. Should such a contrivance be resorted to by the relator, its maintenance would be less astonishing and more plausible than is the assertion of the present claim. Yet it would be inadmissible. Such a device, however, does not concern the system which the relator now seeks to apply. The inquiry in such a case would also be pertinent why, if such was the intent of legislation as early as 1850, it should be thought necessary, in 1866, for the legislature to pass an act (Laws of 1866, chap. 697), supplementary to that of 1850, authorizing the formation of companies to construct, maintain and operate a railway for the conveyance of persons, etc., " by means of a propelling rope or cable attached to stationary power," but giving no authority, expressly or by implication, to do the things now sought for by the relator.

My conclusion is that a permanent structure below the surface is not covered by the grant for a track to be placed on the surface, with a temporary opening for its necessary foundation, and hence that the occupation of the street by the proposed structure of the relator is not within any right acquired by the resolution on Van Schaick's contract, as confirmed by the act of 1854, and that if allowed it would be subversive of the rights of the city. This view of the relator's case makes it unnecessary to inquire whether the declaration contained in the grant, that " no steam power be used on any part of the road for propelling cars," operates as a prohibition against the system sought to be introduced by the relator and for which alone excavations are necessary.

I am not much impressed by the argument of the appellant that the public welfare and comfort requires an assent to the relator's demand. That is a question, however, to be addressed to the legislature, or the city authorities, or both. There is no reason to depart from the general doctrine already adverted to, that whenever privileges are granted by the legislature, and the grant comes under review in the courts, such privileges are to be strictly construed against the corporation and in favor of the public, and that nothing passes but what is granted in

clear and explicit terms. (*Rice* v. *Railroad Co.*, 1 Black. 358.) It was applied in this court in the case of *People ex rel.* v. *Thompson*, already referred to, where an application was made for a *mandamus* requiring a permit to be given to enable the trustees of the Brooklyn bridge to enter upon certain streets for the purpose of laying the foundation for columns necessary for the completion of that great public work according to the plans adopted. The writ was granted, but on appeal to this court the order was reversed upon the ground that the commissioner of public works had no authority to grant the required permit and that the court below erred in allowing the *mandamus*. In replying to the consideration addressed to us as to the many and obvious advantages of the completed work to the two cities and their inhabitants, we held that courts were not at liberty to consider the benefits arising from the plan of the relators, or the necessity and importance of carrying it into effect for the benefit of the public, and that such considerations should have no place in determining questions of the character of the one then before us. We also said that the streets of New York * * * must remain and be used as such, and for no other purpose, until otherwise directed by legislative enactment, and that without this no authority exists for their invasion.

It is possible that such a change in the character of the street as the relator proposes to make would be, as it claims, a public benefit, but the privilege to make it will be followed by great private advantage, and it may be that the city will obtain compensation for granting it. The opportunity to do so should not be taken from it, nor the violation of rights which belong to the public justified upon a forced and unnatural construction of words which, of themselves, have no such consequence.

I cannot close this opinion in more appropriate words than those used in *King* v. *Ward* (4 Adol. & El. 384), and applied in *Davis* v. *Mayor*, etc. (14 N. Y. 525), in both of which cases an argument similar to that of the relator was advanced, and in the first case answered by the declaration of Denman, Ch. J., that " no greater evil can be conceived than the encouragement

of capitalists and adventurers to interfere with known public rights from motives of personal interest, on the speculation that the changes made may be rendered lawful by ultimately being thought to supply the public with something better than what they actually enjoy. There is no practical inconvenience in abiding by the opposite principle, for daily experience proves that great and acknowledged public improvement soon leads to a corresponding change in the law, accompanied, however, with the just condition of being compelled to compensate any portion of the public which may suffer for their advantage."

The order of the court below should be affirmed, with costs.

RUGER, Ch. J., ANDREWS and FINCH, JJ., concur ; EARL, PECKHAM and GRAY, JJ., dissent.

Order affirmed.