CITY OF NEW YORK v. INTERBOROUGH RAPID TRANSIT CO. et al.

(Supreme Court, Appellate Division, First Department. April 10, 1908.)

1. LANDLORD AND TENANT—USE OF PREMISES BY TENANT.

A lessee of real estate is entitled to the exclusive use thereof for any purpose not prohibited by the lease and not amounting to waste or destruction thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, §§ 482–484.]

2. MUNICIPAL CORPORATIONS—LEASE OF SUBWAY—RIGHTS OF LESSEE.

Rapid Transit Act, Laws 1891, p. 3, c. 4, as amended by Laws 1892, p. 158, c. 102, Laws 1892, p. 1087, c. 556, Laws 1894, p. 1125, c. 528, Laws 1894, p. 1873, c. 752, Laws 1895, p. 887, c. 519, and Laws 1896, p. 715, c. 729, creates a board of rapid transit commissioners, prescribes a method for the construction of a subway for a railroad, including ducts for the transmission of electricity, with money furnished by the city of New York, and authorizes the leasing of the property to a lessee to maintain and operate the same. A lease required the lessee to maintain and operate the same for a specified period and to surrender possession at the end of the term, authorized the use of the railroad for the carriage of freight, if such use did not interfere with its use for passengers, and provided that no use of the railroad, or any part of it, or of its equipment, should be made which would interfere with the use for passengers. Held, that the lessee could use the ducts for the transmission for sale of electric currents for motive power, so long as the same did not interfere with the operation of the railroad.

Scott and Clarke, JJ., dissenting.

Appeal from Special Term.

Action by the city of New York, on the information of the Public Service Commission for the First District, against the Interborough

Rapid Transit Company and another. From an interlocutory judgment (55 Misc. Rep. 138, 106 N. Y. Supp. 296), entered on a decision after trial in favor of plaintiff, defendants appeal. Reversed, and new trial ordered.

Argued before INGRAHAM, McLAUGHLIN, CLARKE, SCOTT, and HOUGHTON, JJ.

Edward E. Sprague, for appellants.

George S. Coleman, for respondent.

McLAUGHLIN, J. This action was brought for the purpose of procuring a judgment enjoining the defendant the Interborough Rapid Transit Company from furnishing, and the defendant the New York City Interborough Railway Company from receiving, electric currents through certain ducts built in the walls of the subway, and for an accounting of currents theretofore furnished and received. The trial court rendered a decision in favor of the plaintiff, upon which an interlocutory judgment was entered restraining the defendants and directing an accounting as prayed for in the complaint, from which this appeal is taken.

There is substantially no dispute between the parties as to the facts. The Interborough Rapid Transit Company is the lessee of the Rapid Transit Railroad in the city of New York, constructed pursuant to a contract dated February 21, 1900, between the city and John B. McDonald, and agreements amendatory thereof and supplemental thereto, and is now engaged in operating such railroad under the terms of its lease. The New York City Interborough Railway Company operates a street surface railroad in the city of New York, running from the intersection of 181st street and Broadway, in the borough of Manhattan, to points within the borough of the Bronx. The Interborough Rapid Transit Company has constructed and owns a central power house at or near the corner of Fifty-Eighth street and Twelfth avenue, in the borough of Manhattan, in which electricity in large quantities is produced at its own expense. The currents of electricity from this power house are conducted, by means of ducts laid through the streets of the city, to the subway, and then conducted through ducts, laid partly within the walls of the subway and partly under the surface of the streets, to substations. There the tension of the electric currents is reduced, and, as reduced, fed to various parts of the Rapid Transit Railway for the operation of trains and other purposes. The power plant has the capacity of producing electric currents largely in excess of what is now used in the operation of the Rapid Transit Railroad, and the power required for the operation of the Interborough Railway Company can be supplied without in any way affecting the quantity required in the operation of the former company. The Rapid Transit Company, by means of cables laid in ducts in the walls of the subway, is engaged in transmitting electric currents from its power house to the Interborough Railway Company for motive power in the operation of its cars, under an agreement between the two companies providing for an exchange of traffic. The delivery of such currents to the Interborough Railway Company has not necessitated the use of any ducts in the sub-

way which are now required in the operation of the Rapid Transit Railway, and the furnishing of such currents does not now, nor will the furnishing of the maximum amount to be furnished under the agreement, require the Rapid Transit Company "to generate any more electricity than prudent management requires it to have on hand at all times as a reserve for its own purposes in case of emergency."

The sole question presented by the appeal is whether the Rapid Transit Company can use the ducts in the subway for the purpose stated, and its answer necessarily depends upon the construction to be put upon that company's lease, which was made in pursuance of what is known as the "Rapid Transit Act" (chapter 4, p. 3, Laws of 1891, as amended by chapters 102, 556, pp. 158, 1087, of the Laws of 1892, chapters 528, 752, pp. 1125, 1873, of the Laws of 1894, chapter 519, p. 887, of the Laws of 1895, and chapter 729, p. 715, of the Laws of 1898). Under this act there was created the Board of Rapid Transit Commissioners, and a method was provided by which it, acting for and in behalf of the city of New York, was committed the construction, with money furnished by the municipality, of an underground railroad. The city had nothing to do with the construction, except to furnish the money required therefor, and, through its corporation counsel, to approve of the contract for construction and subsequent operation. The board was required, at the expense of the city, to make plans for the building of a road, which were to include all devices and appurtenances deemed by the board necessary to secure the greatest efficiency, public convenience, and safety. It was also authorized, in its discretion, to include in said plans provisions for subways or tunnels for sewer, gas, or water pipes, electric wires, and other conductors proper to be placed underground, whenever it became necessary or advisable to do so, and it was specifically directed, as soon as the necessary consents had been obtained for a rapid transit railroad and the detailed plans and specifications had been prepared, to—

"enter into a contract with any person, firm or corporation, which in the opinion of the said board shall be best qualified to fulfill and carry out said contract, for the construction of the said road or roads upon the routes and in accordance with the plans and specifications so adopted, for such sum or sums of money, to be raised and paid out of the treasury of the said city * * * on such terms and conditions, not inconsistent with the aforesaid plans and specifications, as said board shall determine to be best for the public interests. * * * Such contract shall also provide that the person, firm or corporation so contracting to construct said road or roads shall, at his, or its own cost and expense, equip, maintain and operate said road or roads for a term of years to be specified in said contract, not less than thirty-five nor more than fifty years, and upon such terms and conditions as to the rates of fare to be charged and the character of service to be furnished and otherwise as said board shall deem to be best suited to the public interests, and subject to such public supervision and to such conditions, regulations and requirements as may be determined upon by said board. * * * Such contract shall further provide, by proper stipulations and covenants on the part of the said city, that the said city shall secure and assure to the contractor, so long as the contractor shall perform the stipulations of the contract, the right to construct and to operate the road as prescribed in the contract, free of all right, claim or other interference. * * * Such contract shall further provide that the person, firm or corporation so contracting to construct, maintain and operate said road shall annually pay into the treasury of said city, as rental for the use of the said road, a sum which shall not, except as herein-

after provided, be less than the annual interest upon the bonds to be issued by said city for the construction of said road as hereinafter provided for, and in addition to said interest, a further sum which shall be equal to a percentage of not less than one per centum upon the whole amount of said bonds. * * *" Section 34, as amended by chapter 729, p. 719, Laws of 1896.

In pursuance of this provision of the rapid transit act the city entered into the contract, by which the contractor agreed to construct and equip the Rapid Transit Railroad upon the route and according to specified plans, "and to put the same into operation and thereafter to use, maintain and operate the same under a lease thereof from the city for a term of fifty years." The contract is divided into three chapters. The first is designated "General;" the second, "Agreement and Construction;" and the third, "The Lease." The opening sentence of the chapter designated "The Lease" is:

"The city hereby lets the railroad to the contractor for the term hereinafter mentioned."

Then follows a description of the railroad, together with a provision that the contractor is to equip, maintain, and operate the road for 50 years, and is to surrender possession of the same at the end of the term, and in the meantime to pay a rental therefor at the minimum rate specified in the rapid transit act. The lease then provides the manner in which the road is to be operated, the kind of trains to be run, and the rates of fare to be charged. The lessee is required to keep the railroad and its equipment, and each and every part thereof, in thorough repair, so that at all times, and at the termination of the lease, the same shall be in "thoroughly good and solid condition and fully and perfectly equipped, presently ready for continuous and practical operation for the full limit of its capacity." He is also to keep the stations, tunnels, and all other parts of the railroad clean and free from unnecessary dampness; to thoroughly light and heat the stations and cars; to keep the waiting rooms in comfortable condition, and to provide therein proper seating capacity; to cause the tunnels, stations, and cars to be thoroughly ventillated with pure air; to keep the tunnels sufficiently lighted at all times to permit the tracks, walls, and roofs to be clearly visible for inspection; and to provide, equip, and maintain a plant for the generation and transmission of the necessary power, which may be either electricity or compressed air. He is not to permit advertisements in the stations or cars "which shall interfere with easy identification of stations, or otherwise with the efficient operation." He can use the railroad for the carriage of freight or express matter; provided, however, that such use shall not, in any event or in any way, interfere with the use of the railroad to its fullest capacity for all passengers. "Nor shall the contractor make any use of the railroad or any part of it, or of its equipment, which shall to any extent or in any way interfere with such use to its fullest capacity for passengers."

After the commencement of the work of construction, provision for the operation of the road by electricity, instead of compressed air, necessitated certain modifications of the plans, including the building of a number of chambers or ducts in the side walls of the sub-

way for the transmission of electric currents.   A question was then raised as to who should bear this expense—that is, whether the construction of such ducts was a part of the construction of the road itself or part of the equipment—and it was finally determined that the same was part of the construction, and for that reason the expense was to be borne by the city.   Matter of McDonald, 80 App. Div. 210, 80 N. Y. Supp. 536, affirmed 175 N. Y. 470, 67 N. E. 1085.   In the plans thus changed a larger number of ducts were constructed than have up to the present time been required for the proper operation of the road.   The lease to McDonald was assigned to the Interborough Rapid Transit Company, in whose place it now stands.   The court found as a fact that the Rapid Transit Company is obliged, for the proper management of the road, to generate more power than it can use, execpt in a case of emergency; and the question is thus squarely presented whether it can, in the manner proposed, use certain ducts in the subway for the transmission of this surplus power, and receive therefor the benefits provided in the traffic agreement between it and the Interborough Railway Company.   The arrangement is beneficial to the Rapid Transit Company, does not injure the city in any way, and in some degree, at least, facilitates in furnishing rapid transit.

The road, it is true, was built with money furnished by the city; but it was built under a contract by the terms of which, as soon as completed, it passed into the possession and control of the contractor for the purpose of operation.   The right thus given to the contractor was a part of the consideration of the contract.   The city owns the road, subject to the rights which were given to the lessee to use and operate it during the term of the lease, and at the termination of which it must be delivered to the city in good condition.   The primary object for which the road was built must not be lost sight of.   It was for the rapid transportation of passengers from one end of Manhattan Island to the other, or along the route of such road.   The statute under which it was built declares the object, and this is made prominent in the contract, as well as that part of it which is termed "The Lease."   To fully accomplish this object, certain restrictions are placed upon the lessee as to the use which shall be made of the road during the term of the lease.   The lessee cannot permit advertisements in the stations or cars which will interfere with efficient operation—cannot make any use of the road which will to any extent interfere with such operation; but that the lessee was intended to be given rights to use the road for purposes other than the transportation of passengers cannot, as it seems to me, be seriously questioned.   He is expressly authorized, if such use does not interfere with the transportation of passengers, to use it for the carriage of freight or express matter, and I think, under a fair construction of the lease, he is given the right to use it for any purpose, provided that the use to which he puts it does not interfere with the primary object.   Otherwise, there is no meaning to the clause:

"Nor shall the contractor make any use of the railroad, or any part of it, or of its equipment, which shall to any extent or in any way interfere with such use to its fullest capacity for passengers."

This **is** a recognition of the right of the lessee to use the demised premises for such collateral purposes as such property might be customarily used. A lessee of real property is entitled to the exclusive use of demised premises for any purpose not prohibited by the lease, not amounting to waste or destruction of the subject-matter. This is the general rule. Baldwin v. Morgan, 43 Hun, 355; Riddle v. Littlefield, 53 N. H. 503, 16 Am. Rep. 388; Lowell v. Strahan, 145 Mass. 1, 12 N. E. 401, 1 Am. St. Rep. 422. The lessee of this road, as it seems to me—subject to the duty to operate the road to its "fullest capacity" for the transportation of passengers, including their comfort and convenience—has under its lease all the other rights usually conferred upon a lessee of real property. A somewhat similar use of public property was recognized and approved in New York Mail & Newspaper Transportation Company v. Shea, 30 App. Div. 266, 51 N. Y. Supp. 563.

There is nothing in the lease which prevents the lessee from using the ducts for the transmission of the electric currents to the Interborough Railway Company. Such use does not interfere with the operation of the Rapid Transit Railroad, nor does it interfere with the comfort or convenience of passengers. On the contrary, it must add to the convenience of some by furnishing an easy access to and from the subway. The right to make this use of the ducts, so long as it does not interfere with the operation of the Rapid Transit Railroad, I am of the opinion passed to the lessee as one of the things granted. It is an incident to the full enjoyment of the demised property.

I am of the opinion the judgment appealed from should be reversed, and a new trial ordered, with costs to appellants to abide event.

HOUGHTON, J., concurs.

INGRAHAM, J. I fully concur with Mr. Justice McLAUGHLIN in his opinion, but I think something should be said in respect to the rule that "the contract as a grant of an exclusive right by a branch of the government is to be strictly construed in favor of the public," and, as included within this general proposition, that a grant of public property shall never by implication be extended to include property or property rights not plainly included within the description contained in the grant. This rule and its limitation was discussed by the Supreme Court of the United States in the leading case of Charles River Bridge v. Warren Bridge, 11 Pet. (U. S.) 420, 9 L. Ed. 773, 938. That case involved the construction of a legislative grant of a franchise, and the principle was applied, and it has been again and again applied in the Supreme Court and in this state, and has never been doubted. Chief Justice Taney, in his opinion, adopts the rule as stated in the case of Proprietors of the Stourbridge Canal v. Wheeley and Others, 2 B. & Ad. 793, as follows:

"The canal having been made under an act of Parliament, the rights of the plaintiffs are derived entirely from that act. This, like many other cases, is a bargain between a company of adventurers and the public, the terms of which are expressed in the statute; and the rule of construction in all such cases is now fully established to be this: That any ambiguity in the terms of

the contract must operate against the adventurers, and in favor of the public, and the plaintiffs can claim nothing that is not clearly given them by the act."

Mr. Justice Story, in his dissenting opinion in the Charles River Bridge Case, thus states the rule:

"It is a well-known rule in the construction of private grants, if the meaning of the words be doubtful, to construe them most strongly against the grantor. But it is said that an opposite rule prevails in cases of grants by the king; for where there is any doubt, the construction is made most favorably for the king, and against the grantee. The rule is not disputed; but it is a rule of very limited application. To what cases does it apply? To such cases only where there is a real doubt, where the grant admits of two interpretations, one of which is more extensive and the other more restricted, so that a choice is fairly open, and either may be adopted without any violation of the apparent object of the grant."

And again:

"But what, I repeat, is most material to be stated, is that all this doctrine in relation to the king's prerogative of having a construction in his own favor is exclusively confined to cases of mere donation, flowing from the bounty of the crown. Whenever the grant is upon a valuable consideration, the rule of construction ceases; and the grant is expounded exactly as it would be in the case of a private grant—favorably to the grantee. Why is this rule adopted? Plainly, because the grant is a contract, and it is to be interpreted according to its fair meaning. It would be to the dishonor of the government that it should pocket a fair consideration, and then quibble as to the obscurities and implications of its own contract."

And I cannot find that the principle as stated by Mr. Justice Story is questioned or disapproved of. This case has been followed in many cases of the Supreme Court of the United States, generally in the construction of legislative grants of a franchise to a corporation. See Fertilizing Company v. Hyde Park, 97 U. S. 659, 24 L. Ed. 1036; Coosaw Mining Co. v. South Carolina, 144 U. S. 550, 12 Sup. Ct. 689, 36 L. Ed. 537; Blair v. City of Chicago, 201 U. S. 400, 26 Sup. Ct. 427, 50 L. Ed. 801; Slidell v. Grandjean, 111 U. S. 412, 4 Sup. Ct. 475, 28 L. Ed. 321. And in Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 Sup. Ct. 224, 50 L. Ed. 353, it was applied to a contract of a municipal corporation granting to a water company the right to construct and maintain waterworks in the city of Knoxville. In this latter case the court say:

"It is true that the cases to which we have referred involved in the main the construction of legislative enactments. But the principles they announce apply with full force to ordinances and contracts by municipal corporations in respect of matters that concern the public. The authorities are all agreed that a municipal corporation, when exerting its functions for the general good, is not to be shorn of its powers by mere implication. If by contract or otherwise it may, in particular circumstances, restrict the exercise of its public powers, the intention to do so must be manifested by words so clear as not to admit of two different or inconsistent meanings."

This principle was then applied because the plaintiff sought by implication to include in the contract authorizing it to construct and maintain waterworks an obligation of the city not to itself construct such waterworks within the corporate limits. This principle has also been applied many times in this state, both as respects the grant of a public franchise by the Legislature, or the grant of property by the state

or a municipal corporation. See People ex rel. Third Ave. R. R. Co. v. Newton, 112 N. Y. 396, 19 N. E. 831, 3 L. R. A. 174; People v. Broadway R. R. Co. of Brooklyn, 126 N. Y. 29, 26 N. E. 961; Trustees of East Hampton v. Vail, 151 N. Y. 463, 45 N. E. 1030; Rhinehart v. Redfield, 93 App. Div. 410, 87 N. Y. Supp. 789, affirmed on opinion below 179 N. Y. 569, 72 N. E. 1150.

The limitation of this principle which is stated by Mr. Justice Story in his dissenting opinion in the Charles River Bridge Case was considered by the Court of Appeals in the case of Langdon v. Mayor, etc., of City of New York, 93 N. Y. 129. In that case the question was as to the construction of a grant by the city of certain lands under water adjacent to the upland property of the grantee for a valuable consideration. This grant contained mutual covenants for the construction of a pier into the river at the joint expense and for the mutual benefit of the parties with a covenant on behalf of the city that the grantee should have the peaceable and quiet possession of the premises, and should use and enjoy to his own use all and all manner of wharfage, benefits, and advantages growing, accruing, or arising by or from the wharf or wharves to be erected on the west end of the premises; and it was claimed by the city that the general rule applicable to the construction of public grants is that such grants are to be construed most favorably to the public and most strongly against the grantee, that nothing should pass by such grants except what is expressed in unequivocal language, and that whatever is not unequivocally granted is deemed to be withheld, nothing passing by implication—the principle insisted upon by the plaintiff as applying to the lease of the railroad to the defendant. In answer to this claim, Judge Earl, delivering the opinion of the court, says:

"The rule of construction has been applied to gratuitous grants made by the sovereign of property, franchises, and privileges upon the solicitation of the grantees, and such were the grants in all the cases cited in the appellants' brief; but, so far as I have discovered, this rule has never been applied, certainly not in its full extent, to grants made for the benefit of the sovereign, upon adequate consideration paid to the sovereign for the thing granted."

The court cited with approval 3 Washburn on Real Property, 172, where it is said:

"This strictness of construction in favor of the sovereign and against the subject applies only in cases where there is a real uncertainty or ambiguity in the terms of the grant. Nor, as it seems, is the rule applicable where the grant is for a valuable consideration. In such case the rule of construction between the government and the subject is the same as between private grantors and grantees."

And after an examination of the authorities the learned judge says:

"We have thus sufficiently referred to authorities as to the rule for the construction of public grants. It will be seen that the common-law rule is recognized in this country, which requires that all grants by the sovereign of exclusive privileges and franchises and all gratuitous grants of land should be strictly construed against the grantee, but that the same strict rule of construction should not be applied to grants of land made for a valuable and adequate consideration paid or agreed to be paid by the grantee."

In the light of these authorities, we will consider just what this contract "granted to the defendants." In the first place, it did not con-

fer upon the defendant a franchise. That franchise was granted by the people of the state, and when the defendant became incorporated under the general railroad law it acquired a franchise to construct and operate a railroad. The defendant, thus having a franchise to operate a railroad, procured from McDonald an assignment of this contract between McDonald and the city of New York. By that contract McDonald agreed to construct this underground road for a price fixed to be paid by the city of New York. The city of New York leased the road constructed under the contract to McDonald. The contract provided:

"The city hereby lets the railroad to the contractor for the term hereinafter mentioned. The railroad hereby leased includes the railway constructed under the routes and general plan thereof prescribed by the resolutions of the board adopted on the 14th day of January, and on the 4th day of February, 1897, together with terminals, stations, and all other appurtenances whatsoever of the said railroad, but not including the equipment thereof," for a fixed term.

The lessee covenanted to fully equip the road, to operate it as a railroad, and to pay to the city as rental for the property demised a sum equal to the annual interest upon the bonds issued, to provide means for the construction of the subway, and a further annual sum which should be equal to 1 per centum upon the whole amount of such bonds. This lease was certainly for a full and adequate consideration. It assured to the city during the term demised, not only the interest upon the bonds which had been issued to provide means of construction, but also an amount which it was assumed would pay the principal of the bonds during the term. Many other onerous obligations were imposed upon the lessee, and in consideration of the payment of this rent and the performance of the covenants there was leased to the lessee the railroad constructed under the routes and general plan thereof prescribed by the resolution of the board, and "all other appurtenances whatsoever of the said railroad." Now, these ducts, the right to use which is involved in this action, were a part of the railroad constructed under this contract which was paid for by the city, or an appurtenance of the said railroad; the contractor being bound to pay the interest and 1 per centum of the principal each year as rental for the beneficial use of what has been constructed under the contract. The property leased to the contractor, therefore, included these ducts, as well as the rest of the railroad, and he was to pay by way of rental all that it had cost the city to construct it.

It seems to me entirely clear by the terms of the lease, without respect to any implication or the construction of ambiguous provisions, that the contractor was entitled to the possession of these ducts and to use them in the operation of the railroad; and this seems to be conceded by plaintiff. The city had parted with the right to the possession of the ducts, as well as the rest of the road, and certainly could not take possession of them from the defendant and use them for its own purposes, whether the lessee used them or not. But the plaintiff says, although entitled to the possession and to use them in the operation of the railroad, the defendant is not entitled to use them for anything else, although the use of which complaint is made is a strictly railroad

use, for the purposes of operating a surface line railroad which brings to the railroad operated by the defendant a substantial increase of business and is a distinct advantage to the public in enabling passengers to be carried over both railroads for a substantially reduced fare. It seems to me that the plaintiff here is seeking to inject into this lease a covenant restricting the use of the property leased to McDonald which is not in the lease and which is expressly negatived by its provisions. No case that has been cited and no principle of law of England or of this country, with which I am acquainted, justifies the insertion of a restrictive covenant in property leased or conveyed by the municipality, where no such covenant is either expressly or by implication contained in the grant or lease.

Applying the principle relied on by the plaintiff to its fullest extent, it is only where a grantee attempts to obtain by implication or by ambiguous clauses what the grant does not expressly convey, not where the public seek to insert in the grant or lease a restrictive covenant by implication. For a full and adequate consideration the city of New York has granted to the defendant's assignor this railroad upon terms satisfactory to itself and which provide for an adequate return for the use of the property. It saw fit to restrict the use to which the lessee should put the property in certain respects, but did not attempt to restrict the use to which the defendant should put these ducts, except by a general provision that it should not use any of the demised property in any way so as to interfere with the fullest operation of the railroad. I think the lessee has the right to make use of the property leased so far as such use does not in any way violate any of the covenants or conditions of the lease.

SCOTT, J. I dissent. In my opinion the contract under which the defendant operates the Rapid Transit Railway partakes much more of the character of a grant from the public than of a lease, as the latter term is ordinarily used, and it is too well established to justify discussion that a grantee from the public takes nothing from implication which is not to be by fair construction found in the terms of the grant itself. The railway and the structure in which it runs are the property of the city of New York, and their use is granted to the contractor solely to the end that the railroad may be operated for the benefit and use of the public. All that the third chapter of the contract, denominated "The Lease," purports to grant to the contractor, is the "railroad," and the agreement of the latter is to equip, maintain, and operate the "railroad." There cannot be found anywhere within the lines of the contract any express agreement to lease the structure for general purposes, or for any purpose other than that of operating a railroad, which, while it may carry with it the right to use the structure for such purposes as are naturally and customarily connected with railroad operation, does not include the right to use the structure for the carrying on of a business not germane to, nor connected with, the operation of a railway in the structure. The purely negative condition that the contractor may not "make any use of the railroad, or any part of it, or of its equipment, which shall to any extent or in any way interfere with such use to its fullest capacity for passengers,"

cannot be transformed into a positive covenant that the structure may be put to any use, whether connected with the operation of the road or not, which would not interfere with its use for passengers.

There are numerous ways in which a railroad property may be used for railroad purposes other than the carrying of passengers, and, since the rapid transit road was intended primarily for passenger traffic, the condition quoted was undoubtedly inserted for greater caution, to insure that, however the road might be operated, the carrying of passengers should always be the first consideration. If the ducts used for the transmission of electricity for sale had been built by the contractor at its own expense as part of the equipment, a different question would perhaps be presented; but they were not so built. They constitute a part of the city's property, built with the city's money, and leased to the contractor solely for the purpose of operating the railroad, the public necessity for which created the sole authority for the expenditure of the public money for such a proposal Sun Print. & Pub. Co. v. Mayor, etc., 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788. It is quite true that there are many more ducts in the structure than can be presently used in the operation of the railroad, and that the use of the ducts for carrying wires does not injure the structure, and that the company can now manufacture more electricity than is needed to operate the railroad at the present time, and therefore the city cannot be said to be injured to any appreciable extent by the use of the ducts for the transmission of the electricity for sale. That, however, is not the question with which we have to deal; but it is the broad question whether or not, under its contract, the contractor may use the structure for other purposes of private gain than the operation of the railroad for which the structure was erected and leased. The development of science is rapid, and the ingenuity of man is unlimited, and if it be now established that the contractor may use the structure belonging to the city for any purpose whatever, except that of maintaining and operating the rapid transit railway, it is impossible to foresee to what uses it may hereafter be put.

The case, much relied on by defendants, of N. Y. Mail & Newspaper T. Co. v. Shea, 30 App. Div. 266, 51 N. Y. Supp. 563, is of slight assistance in determining the question we are now called upon to consider, which is solely as to the scope and construction of the contract between the city and the contractor. It may be authority for the proposition that it is competent for the city, by an unambiguous contract and for a proper consideration, to grant to the defendant the right to use the subway ducts in the manner and for the purpose it is now using them.

In my opinion the interlocutory judgment should be affirmed, with costs.

CLARKE, J., concurs.